# SECRETARY OF THE INTERIOR ET AL. *v.* CALIFORNIA ET AL.

No. 82–1326.   Argued November 1, 1983—Decided January 11, 1984*

---

*Together with No. 82–1327, *Western Oil & Gas Association et al.* v. *California et al.*, and No. 82–1511, *California et al.* v. *Secretary of the Interior et al.*, also on certiorari to the same court.

*Solicitor General Lee* argued the cause for petitioners in No. 82–1326 and respondents in No. 82–1511. With him on the briefs were *Assistant Attorney General Dinkins, Deputy Solicitors General Wallace* and *Claiborne, Acting Assistant Attorney General Habicht, Richard G. Wilkins, Peter R. Steenland, Jr.,* and *Anne S. Almy. E. Edward Bruce* argued the cause for Western Oil & Gas Association et al., petitioners in No. 82–1327 and respondents in No. 82–1511. With him on the briefs was *Howard J. Privett.*

*Theodora Berger,* Assistant Attorney General, argued the cause for the State of California et al. in all cases. With her on the brief for the State of California et al., respondents in Nos. 82–1326 and 82–1327, were *John K. Van de Kamp,* Attorney General, *N. Gregory Taylor,* Assistant Attorney General, and *John A. Saurenman,* Deputy Attorney General. *Roger Beers, Kathryn Burkett Dickson,* and *William M. Boyd* filed a brief for the County of Humboldt et al., respondents in Nos. 82–1326 and 82–1327. Mr. Van de Kamp, Mr. Taylor, Ms. Berger, Mr. Saurenman, *Trent W. Orr,* Mr. Beers, Ms. Dickson, and Mr. Boyd filed briefs for petitioners in No. 82–1511. Mr. Orr filed a brief for the Natural Resources Defense Council, Inc., et al., respondents in Nos. 82–1326 and 82–1327.†

---

†Briefs of *amici curiae* urging affirmance were filed for the State of Alaska by *Norman C. Gorsuch,* Attorney General, and *G. Thomas Koester,* Assistant Attorney General; for the State of Florida by *Jim Smith,* Attorney General, and *Gerald B. Curington* and *Bruce Barkett,*

JUSTICE O'CONNOR delivered the opinion of the Court.

These cases arise out of the Department of the Interior's sale of oil and gas leases on the Outer Continental Shelf (OCS) off the coast of California. We must determine whether the sale is an activity "directly affecting" the coastal zone under § 307(c)(1) of the Coastal Zone Management Act (CZMA). That section provides in its entirety:

> "Each Federal agency conducting or supporting activities directly affecting the coastal zone shall conduct or support those activities in a manner which is, to the maximum extent practicable, consistent with approved state management programs." 86 Stat. 1285, 16 U. S. C. § 1456(c)(1) (1982 ed.).

We conclude that the Secretary of the Interior's sale of Outer Continental Shelf oil and gas leases is not an activity "directly affecting" the coastal zone within the meaning of the statute.

I

CZMA defines the "coastal zone" to include state but not federal land near the shorelines of the several coastal States, as well as coastal waters extending "seaward to the outer limit of the United States territorial sea." 16 U. S. C. § 1453(1) (1982 ed.). The territorial sea for States bordering on the Pacific Ocean or Atlantic Ocean extends three geographical miles seaward from the coastline. See 43 U. S. C. § 1301; *United States* v. *California*, 381 U. S. 139 (1965). Submerged lands subject to the jurisdiction of the United

Assistant Attorneys General; for the State of New Jersey by *Irwin I. Kimmelman*, Attorney General, and *Deborah T. Poritz* and *John M. Van Dalen*, Deputy Attorneys General; and for the Coastal States Organization et al. by *H. Bartow Farr III* and the Attorneys General for their respective States as follows: *Joseph Lieberman* of Connecticut, *Charles M. Oberly III* of Delaware, *Tany S. Hong* of Hawaii, *James E. Tierney* of Maine, *Stephen H. Sachs* of Maryland, *Francis X. Bellotti* of Massachusetts, *Robert Abrams* of New York, *Rufus L. Edmisten* of North Carolina, *Dave Frohmayer* of Oregon, and *Kenneth O. Eikenberry* of Washington.

States that lie beyond the territorial sea constitute the "outer Continental Shelf." See 43 U. S. C. § 1331(a). By virtue of the Submerged Lands Act, passed in 1953, the coastal zone belongs to the States, while the OCS belongs to the Federal Government. 43 U. S. C. §§ 1302, 1311.

CZMA was enacted in 1972 to encourage the prudent management and conservation of natural resources in the coastal zone. Congress found that the "increasing and competing demands upon the lands and waters of our coastal zone" had "resulted in the loss of living marine resources, wildlife, nutrient-rich areas, permanent and adverse changes to ecological systems, decreasing open space for public use, and shoreline erosion." 16 U. S. C. § 1451(c) (1982 ed.). Accordingly, Congress declared a national policy to protect the coastal zone, to encourage the States to develop coastal zone management programs, to promote cooperation between federal and state agencies engaged in programs affecting the coastal zone, and to encourage broad participation in the development of coastal zone management programs. 16 U. S. C. § 1452 (1982 ed.).

Through a system of grants and other incentives, CZMA encourages each coastal State to develop a coastal management plan. Further grants and other benefits are made available to a coastal State after its management plan receives federal approval from the Secretary of Commerce. To obtain such approval a state plan must adequately consider the "national interest" and "the views of Federal agencies principally affected by such program." 16 U. S. C. §§ 1455(c)(8), 1456(b) (1982 ed.).

Once a state plan has been approved, CZMA § 307(c)(1) requires federal agencies "conducting or supporting activities directly affecting the coastal zone" to do so "consistent" with the state plan "to the maximum extent practicable." 16 U. S. C. § 1456(c)(1) (1982 ed.). The Commerce Department has promulgated regulations implementing that provision. Those regulations require federal agencies to prepare a "con-

sistency determination" document in support of any activity that will "directly affect" the coastal zone of a State with an approved management plan. The document must identify the "direct effects" of the activity and inform state agencies how the activity has been tailored to achieve consistency with the state program. 15 CFR §§ 930.34, 930.39 (1983).

## II

OCS lease sales are conducted by the Department of the Interior (Interior). Oil and gas companies submit bids, and the high bidders receive priority in the eventual exploration for and development of oil and gas resources situated in the submerged lands on the OCS. A lessee does not, however, acquire an immediate or absolute right to explore for, develop, or produce oil or gas on the OCS; those activities require separate, subsequent federal authorization.

In 1977, the Department of Commerce approved the California Coastal Management Plan. The same year, Interior began preparing Lease Sale No. 53—a sale of OCS leases off the California coast near Santa Barbara. Interior first asked several state and federal agencies to report on potential oil and gas resources in this area. The agency then requested bidders, federal and state agencies, environmental organizations, and the public to identify which of 2,036 tracts in the area should be offered for lease. In October 1978, Interior announced the tentative selection of 243 tracts, including 115 tracts situated in the Santa Maria Basin located off western Santa Barbara. Various meetings were then held with state agencies. Consultations with other federal agencies were also initiated. Interior issued a Draft Environmental Impact Statement in April 1980.

On July 8, 1980, the California Coastal Commission informed Interior that it had determined Lease Sale No. 53 to be an activity "directly affecting" the California coastal zone. The State Commission therefore demanded a consistency determination—a showing by Interior that the lease sale

would be "consistent" to the "maximum extent practicable" with the state coastal zone management program.   Interior responded that the lease sale would not "directly affect" the California coastal zone.   Nevertheless, Interior decided to remove 128 tracts, located in four northern basins, from the proposed lease sale, leaving only the 115 tracts in the Santa Maria Basin.   In September 1980, Interior issued a final Environmental Impact Statement.   On October 27, 1980, it published a proposed notice of sale, limiting bidding to the remaining 115 blocks in the Santa Maria Basin.   45 Fed. Reg. 71140 (1980).

On December 16, 1980, the State Commission reiterated its view that the sale of the remaining tracts in the Santa Maria Basin "directly affected" the California coastal zone.   The Commission expressed its concern that oil spills on the OCS could threaten the southern sea otter, whose range was within 12 miles of the 31 challenged tracts.   The Commission explained that it "has been consistent in objecting to proposed offshore oil development within specific buffer zones around special sensitive marine mammal and seabird breeding areas . . . ."   App. 77.   The Commission concluded that 31 more tracts should be removed from the sale because "leasing within 12 miles of the Sea Otter Range in the Santa Maria Basin would not be consistent" with the California Coastal Management Program.   *Id.*, at 79.[1]   California Governor Brown later took a similar position, urging that 34 more tracts be removed.   *Id.*, at 81.[2]

Interior rejected the State's demands.   In the Secretary's view, no consistency review was required because the lease sale did not engage CZMA § 307(c)(1), and the Governor's request was not binding because it failed to strike a reasonable

---

[1] Four of the objectionable tracts were combined as two for sale purposes, so the Commission's conclusion was actually directed to 29 sale tracts.   *California* v. *Watt*, 520 F. Supp. 1359, 1367 (CD Cal. 1981).

[2] Again, the objection encompassed only 32 sale tracts.   *Ibid.*

balance between the national and local interests. On April 10, 1981, Interior announced that the lease sale of the 115 tracts would go forward, and on April 27 issued a final notice of sale. 46 Fed. Reg. 23674 (1981).

California and other interested parties (hereafter respondents) filed two substantially similar suits in Federal District Court to enjoin the sale of 29 tracts situated within 12 miles of the Sea Otter Range.[3] Both complaints alleged, *inter alia*, Interior's violation of §307(c)(1) of CZMA.[4] They argued that leasing sets in motion a chain of events that culminates in oil and gas development, and that leasing therefore "directly affects" the coastal zone within the meaning of §307(c)(1).

The District Court entered a summary judgment for respondents on the CZMA claim. *California* v. *Watt*, 520 F.

---

[3] The litigation was instituted through separate but similar complaints filed by the State of California and by the Natural Resources Defense Council, Inc., the Sierra Club, Friends of the Earth, Friends of the Sea Otter, and the Environmental Coalition on Lease Sale No. 53. Plaintiffs sought declaratory and injunctive relief against the Secretary of the Interior and two other officials within the Department of the Interior. The Department itself, and the Bureau of Land Management, were also named as defendants. Western Oil and Gas Association, a regional trade association, and 12 of its members, intervened as defendants. Subsequently, various local governmental entities within California intervened as plaintiffs in the case commenced by the State.

Petitioner-defendants (hereafter petitioners) state their disagreement with the Court of Appeals for the Ninth Circuit's holding that environmental groups and local governments have standing to sue under CZMA §307(c)(1), but do not challenge that standing decision here. Since the State of California clearly does have standing, we need not address the standing of the other respondents, whose position here is identical to the State's.

[4] Respondents claimed below that petitioners had also violated four other federal statutes. The District Court ruled for the defendants on those four claims, and the Court of Appeals for the Ninth Circuit affirmed the judgment on the non-CZMA claims that were appealed. Those claims are not presented here.

Supp. 1359 (CD Cal. 1981). The Court of Appeals for the Ninth Circuit affirmed that portion of the District Court judgment that required a consistency determination before the sale.[5] *California* v. *Watt*, 683 F. 2d 1253 (1982). We granted certiorari, 461 U. S. 925 (1983), and we now reverse.

## III

Whether the sale of leases on the OCS is an activity "directly affecting" the coastal zone is not self-evident.[6] As

---

[5] The Court of Appeals went on to rule that the Federal Government, not the State, makes the final determination as to whether a federal activity is consistent "to the maximum extent practicable" with the state management program. In view of our conclusion that a lease sale is not subject to § 307(c)(1)'s consistency review requirements, we need not decide who holds final authority to determine when sufficient consistency has been achieved.

[6] The National Oceanic and Atmospheric Administration (NOAA) in the Department of Commerce is the federal agency charged with administering CZMA. See 16 U. S. C. § 1463 (1982 ed). Under normal circumstances NOAA's understanding of the meaning of CZMA § 307(c)(1) would be entitled to deference by the courts. But in construing § 307(c)(1) the agency has walked a path of such tortured vacillation and indecision that no help is to be gained in that quarter.

In 1977, NOAA expressly declined to take a position on the applicability of § 307(c)(1) to the leasing process. See 42 Fed. Reg. 43591–43592 (1977). In 1978, NOAA issued regulations purporting to clarify § 307(c)(1), but the agency expressly acknowledged that the applicability of the section to lease sales was "still under consideration." 43 Fed. Reg. 10512 (1978). Interior nevertheless objected to the new verbal formulation of "directly affecting" that NOAA had proposed, and the interdepartmental dispute was submitted to the Department of Justice's Office of Legal Counsel (OLC). OLC rejected crucial portions of NOAA's regulations as inconsistent with the statutory language, and those portions were withdrawn by NOAA. App. 45–46; 44 Fed. Reg. 37142 (1979). In 1980 NOAA noted its view that OCS sales trigger consistency review requirements in a letter from NOAA to State Coastal Management Program Directors (Apr. 9, 1980). NOAA later renewed its attempt to arrive at a general definition of "directly affecting." Two weeks after the instant litigation commenced, NOAA took the position that lease sales do not directly affect the coastal zone. 46 Fed. Reg. 26660 (1981). But shortly after the

already noted, OCS leases involve submerged lands outside the coastal zone, and as we shall discuss, an OCS lease authorizes the holder to engage only in preliminary exploration; further administrative approval is required before full exploration or development may begin. Both sides concede that the preliminary exploration itself has no significant effect on the coastal zone. Both also agree that a lease sale is one (not the first, see *infra*, at 337) in a series of decisions that may culminate in activities directly affecting that zone.

## A

We are urged to focus first on the plain language of § 307(c)(1). Interior contends that "directly affecting" means "[h]av[ing] a [d]irect, [i]dentifiable [i]mpact on [t]he [c]oastal [z]one." Brief for Federal Petitioners 20. Respondents insist that the phrase means "[i]nitiat[ing] a [s]eries of [e]vents of [c]oastal [m]anagement [c]onsequence." Brief for Respondent State of California et al. 10.[7] But CZMA nowhere defines or explains which federal activities should be viewed as "directly affecting" the coastal zone, and the alternative verbal formulations proposed by the parties, both of which are superficially plausible, find no support in the Act itself.

We turn therefore to the legislative history.[8] A fairly detailed review is necessary, but that review persuades us that

regulation was published in final form, *id.*, at 35253, the House Committee on Merchant Marine and Fisheries exercised a "legislative veto," see 16 U. S. C. § 1463a (1982 ed.), and the agency withdrew its regulation. 47 Fed. Reg. 4231 (1982).

[7] This formulation finds support in 1980 House and Senate Reports. H. R. Rep. No. 96–1012, p. 34; S. Rep. No. 96–783, p. 11. For reasons explained in n. 15, *infra*, we do not believe these Committee views, articulated many years after CZMA's passage, are reliable guides to the intent of the full Congress acting in 1972.

[8] As discussed *infra*, at 331–341, other sections of CZMA, as well as related provisions in the Outer Continental Shelf Lands Act of 1953, have been significantly amended since 1972. But § 307(c)(1) has not been changed since its enactment. Our decision must therefore turn principally on the language of § 307(c)(1) and the legislative history of the original, 1972 CZMA.

Congress did not intend OCS lease sales to fall within the ambit of CZMA § 307(c)(1).

In the CZMA bills first passed by the House and Senate, § 307(c)(1)'s consistency requirements extended only to federal activities "in" the coastal zone. The "directly affecting" standard appeared nowhere in § 307(c)(1)'s immediate antecedents. It was the House-Senate Conference Committee that replaced "in the coastal zone" with "directly affecting the coastal zone." Both Chambers then passed the Conference bill without discussing or even mentioning the change.

At first sight, the Conference's adoption of "directly affecting" appears to be a surprising, unexplained, and subsequently unnoticed expansion in the scope of § 307(c)(1), going beyond what was required by either of the versions of § 307(c)(1) sent to the Conference. But a much more plausible explanation for the change is available.

The explanation lies in the two different definitions of the "coastal zone." The bill the Senate sent to the Conference defined the coastal zone to exclude "lands the use of which is by law subject solely to the discretion of or which is held in trust by the Federal Government, its officers or agents."[9]

---

[9] S. 3507, 92d Cong., 2d Sess., § 304(a) (1972), reprinted at 118 Cong. Rec. 14188 (1972). The Senate's definition is now codified (with subsequent minor amendments) in 16 U. S. C. § 1453(1) (1982 ed.).

There was language in an earlier Senate Report (not the final CZMA Senate Report) urging that federal activities determined to have a "functional interrelationship" with the coastal zone "should" be administered consistently with approved state management programs. S. Rep. No. 92–526, pp. 20, 30 (1971). Nine years later a House Report reiterated the "functional interrelationship" standard. H. R. Rep. No. 96–1012, p. 34 (1980). But the Senate Report's language was purely precatory. It used "should," rather than the "shall" that actually appears in § 307(c)(1), and more importantly, was written in connection with a Senate bill that would have *entirely exempted* activities on all federal lands from § 307(c)(1)'s mandate. It is fanciful to suggest that an early Senate *Report* should be read as endorsing an expansive interpretation of § 307(c)(1)'s "directly affecting" language when the Senate *bill* that the Report accompanied did not include the relevant phrase and indisputably did *not* reach OCS lease sales.

This exclusion would reach federal parks, military installations, Indian reservations, and other federal lands that would lie within the coastal zone but for the fact of federal ownership. Under the Senate bill, activities on these lands would thus have been entirely exempt from compliance with state management plans. By contrast, the House bill's definition of "coastal zone" included lands under federal jurisdiction; thus federal activities on those lands were to be fully subject to § 307(c)(1)'s consistency requirement. Under *both* bills, however, submerged lands on the OCS were entirely excluded from the coastal zone, and federal agency activities in those areas thus were exempt from § 307(c)(1)'s consistency requirement.

Against this background, the Conference Committee's change in § 307(c)(1) has all the markings of a simple compromise. The Conference accepted the Senate's narrower definition of the "coastal zone," but then expanded § 307(c)(1) to cover activities on federal lands not "in" but nevertheless "directly affecting" the zone. By all appearances, the intent was to reach at least some activities conducted in those federal enclaves excluded from the Senate's definition of the "coastal zone."

Though cryptic, the Conference Report's reference to the change in § 307(c)(1) fully supports this explanation. "The Conferees . . . adopted the Senate language . . . which made it clear that Federal lands are not included within a state's coastal zone. *As to the use of such lands which would affect a state's coastal zone, the provisions of section 307(c) would apply.*" H. R. Conf. Rep. No. 92–1544, p. 12 (1972) (emphasis added). In the entire Conference Report, this is the only mention of the definition of the coastal zone chosen by the Conference, and the only hint of an explanation for the change in § 307(c)(1). The "directly affecting" language was not deemed worthy of note by any Member of Congress in the subsequent floor debates.[10] The implication seems clear:

---

[10] On the other hand, in comments on the floor made before the House acted on the post-Conference bill, Congressman Mosher stated: "The final

"directly affecting" was used to strike a balance between two definitions of the "coastal zone." The legislative history thus strongly suggests that OCS leasing, covered by *neither* the House nor the Senate version of § 307(c)(1), was also intended to be outside the coverage of the Conference's compromise.

Nonetheless, the literal language of § 307(c)(1), read without reference to its history, is sufficiently imprecise to leave open the possibility that some types of federal activities conducted on the OCS could fall within § 307(c)(1)'s ambit. We need not, however, decide whether any OCS activities other than oil and gas leasing might be covered by § 307(c)(1), because further investigation reveals that in any event Congress expressly intended to remove the control of OCS resources from CZMA's scope.

## B

If § 307(c)(1) and its history standing alone are less than crystalline, the history of other sections of the original CZMA bills impels a narrow reading of that clause. Every time it faced the issue in the CZMA debates, Congress deliberately and systematically insisted that no part of CZMA was to reach beyond the 3-mile territorial limit.

There are, first, repeated statements in the House and Senate floor debates that CZMA is concerned only with activities on land or in the territorial sea, not on the OCS, and that the allocation of state and federal jurisdiction over the coastal zone and the OCS was not to be changed in any way.[11] But

version in no way affects the jurisdictional responsibilities of . . . the Department of the Interior in regard to the administration of Federal lands, since the conferees have specifically eliminated those land areas from the definition of coastal zone." 118 Cong. Rec. 35548 (1972).

[11] See, *e. g.*, *id.*, at 14180 ("This bill covers the territorial seas; it does not cover the Outer Continental Shelf") (remark of Sen. Stevens); *id.*, at 14184 (facilities in the "contiguous zone" "would be outside the jurisdiction of the neighboring States") (remark of Sen. Boggs); *ibid.* ("this bill attempts to deal with the Territorial Sea, not the Outer Continental Shelf") (remark of Sen. Moss); *id.*, at 14185 ("we wanted to make certain that Federal

Congress took more substantial and significant action as well. Congress debated and firmly rejected at least four proposals to extend parts of CZMA to reach OCS activities.

Section 313 of the House CZMA bill, as reported by Committee and passed by the House, embodied the most specific of these proposals. That section would have achieved explicitly what respondents now contend § 307(c)(1) achieves implicitly. It provided:

> "(a) The Secretary shall develop . . . a program for the management of the area outside the coastal zone and within twelve miles of the [coast] . . . .
>
> "(b) To the extent that any part of the management program . . . shall apply to any high seas area, the subjacent seabed and subsoil of which lies within the seaward boundary of a coastal state, . . . the program shall be coordinated with the coastal state involved. . . .
>
> "(c) The Secretary shall, to the maximum extent practicable, apply the program . . . to waters which are adjacent to specific areas in the coastal zone which have been designated by the states for the purpose of preserving or restoring such areas for their conservation, recreational,

jurisdiction was unimpaired beyond the 3-mile limit in the territorial sea") (remark of Sen. Hollings); *ibid.* ("this bill focuses on the territorial sea or the area that is within State jurisdiction, and preserves the Federal jurisdiction beyond, which is not to be considered or disturbed by the bill at this time") (remark of Sen. Moss); *id.*, at 26479 ("the measure does not diminish Federal or State jurisdiction, responsibility, or rights under other programs and does not supersede, modify, or repeal existing Federal law") (remark of Cong. Mosher); *id.*, at 26484 ("the Federal Government has jurisdiction outside the State area, from 3 miles to 12 miles at sea") (remark of Cong. Anderson); *id.*, at 35548 ("The final version [of CZMA] in no way affects the jurisdictional responsibilities of . . . the Department of Interior in regard to the administration of Federal lands, since the conferees have specifically eliminated those land areas from the definition of coastal zone") (remark of Cong. Mosher); *id.*, at 35550 ("the Federal Government has jurisdiction outside the State area, from 3 to 12 miles at sea") (remark of Cong. Anderson).

ecological, or esthetic values." H. R. 14146, 92d Cong., 2d Sess., § 313 (1972), reprinted in H. R. Rep. No. 92–1049, p. 7 (1972).

Congressman Anderson of California, the drafter of this section and coauthor of the House CZMA bill, explained the section's purpose on the floor of the House. In light of the instant litigation, his comments were remarkably prescient. By 1972, Congressman Anderson pointed out, California had established seven marine sanctuaries, including one located near Santa Barbara, Cal., in the area allegedly threatened by the leases here in dispute.

> "These State-established sanctuaries, which extend from the coastline seaward to 3 miles, account for nearly a fourth of the entire California coast.
>
> "However, the Federal Government has jurisdiction outside the State area, from 3 miles to 12 miles at sea. All too often, the Federal Government has allowed development and drilling to the detriment of the State program.
>
> "A case in point is Santa Barbara where California established a marine sanctuary banning the drilling of oil in the area under State authority.
>
> "Yet, outside the sanctuary—in the federally controlled area—the Federal Government authorized drilling which resulted in the January 1969 blowout. This dramatically illustrated the point that oil spills do not respect legal jurisdictional lines." 118 Cong. Rec. 26484 (1972).[12]

House § 313, Congressman Anderson went on to explain, would play the crucial role of encouraging federal OCS oil

---

[12] Congressman Anderson repeated these remarks when he opposed an amendment that would have weakened House § 312, *id.*, at 26495, and again when he expressed his concern over the removal of House § 312 by the Senate-House Conference, *id.*, at 35550.

and gas leasing to be conducted in a manner consistent with state management programs. *Ibid.;* see also *id.,* at 26495, 35549–35550.

Since House § 313 would have provided respondents with precisely the protection they now seek here, it is significant that the Conference Committee, and ultimately the Congress as a whole, flatly rejected the provision. And the reason for the rejection, as explained in the Conference Report, was to forestall conflicts of the type before us now. "The Conferees . . . excluded [House § 313] authorizing a Federal management program for the contiguous zone of the United States, because the provisions relating thereto did not prescribe sufficient standards or criteria *and would create potential conflicts with legislation already in existence concerning Continental Shelf resources.*" H. R. Conf. Rep. No. 92–1544, p. 15 (1972) (emphasis added).

The House bill included another similar provision that would have been almost equally favorable to respondents here—had it not been rejected by the Conference and subsequently by Congress as a whole. Sections 312(b), (c), of the House bill invited the Secretary of Commerce to extend coastal zone marine sanctuaries established by the States into the OCS region.[13] But the Conference Committee rejected House § 312 as well. The Conference Report explained: "The Conferees agreed to delete the provisions of the House

---

[13] The section provided:

"(b) When an estuarine sanctuary is established by a coastal state . . . the Secretary, at the request of the state concerned, . . . may extend the established estuarine sanctuary seaward beyond the coastal zone, to the extent necessary to effectuate the purposes for which the estuarine sanctuary was established.

"(c) The Secretary shall . . . assure that the development and operation [of the sanctuary extension] is coordinated with the development and operation of the estuarine sanctuary of which it forms an extension." H. R. 14146, 92d Cong., 2d Sess., §§ 312(b), (c) (1972), reprinted in H. R. Rep. No. 92–1049, p. 7 (1972).

version relating to extension of estuarine sanctuaries, in view of the fact that the need for such provisions appears to be rather remote and could cause problems since they would extend beyond the territorial limits of the United States." H. R. Conf. Rep. No. 92–1544, pp. 14–15 (1972).

When the Conference bill returned to the House, with House §§ 312 and 313 deleted, Congressman Anderson expressed his dismay:

> "I am deeply disappointed that the Senate conferees would not accept the position of the House of Representatives regarding the extension of State-established marine sanctuaries to areas under Federal jurisdiction.
>
> ". . . [W]e were successful, in committee, in adding a provision which I authored designed to protect State-established sanctuaries, such as exis[t] off Santa Barbara, Calif., from federally authorized development.
>
> "This provision would have required the Secretary to apply the coastal zone program to waters immediately adjacent to the coastal waters of a State, which that State has designated for specific preservation purposes.
>
> "It was accepted overwhelmingly by the House of Representatives despite the efforts of the oil and petroleum industry to defeat it.
>
> "But what they failed to accomplish in the House, they accomplished in the conference committee . . . ." 118 Cong. Rec. 35549–35550 (1972).

In light of these comments by Congressman Anderson, and the express statement in the Conference Report that House § 313 was removed to avoid "conflicts with legislation already in existence concerning Continental Shelf resources," see *supra,* at 327, it is fanciful to suggest that the Conferees intended the "directly affecting" language of § 307(c)(1) to substitute for the House § 313's specific and considerably more detailed language. Certainly the author of House § 313 recognized that the amended § 307(c)(1) could not serve that purpose.

Two similar attempts to extend CZMA's reach beyond the coastal zone were made in the Senate. These, as well, were firmly rejected on the Senate floor or in Conference.[14]

---

[14] An amendment to CZMA proposed by Senator Boggs on the Senate floor would have given respondents all that they are asking for here. The amendment stated:

"Notwithstanding any other provision of this Act, no Federal department or agency shall construct, or license, or lease, or approve in any way the construction of any facility of any kind beyond the territorial sea off the coast of the United States until (1) such department or agency has filed with the Administrator of the Environmental Protection Agency, a complete report with respect to the proposed facility; (2) the Administrator has forwarded such report to the Governor of each adjacent coastal State which might be adversely affected by pollution from such facility; and (3) each such Governor has filed an approval of such proposal with the Administrator. . . ." 118 Cong. Rec. 14183 (1972).

In proposing the amendment Senator Boggs explained his concern with offshore oil transfer terminals located at sites outside the 3-mile territorial limit.

"Such sites, of course, would place these facilities in the contiguous zone, or in international waters on the Continental Shelf. If that were so, of course, the facility would be outside the jurisdiction of the neighboring States.

"Yet, the coastal zones of these neighboring States could be severely and adversely affected by pollution that might come from such an offshore facility.

". . . I believe it is important that the affected States play a meaningful role in the plan to construct such a facility." *Id.*, at 14184.

But other Senators immediately attacked Senator Boggs' amendment. Senator Hollings stated:

"The amendment . . . goes beyond the territorial sea and goes into what we agreed on and compromised on awhile ago. It goes beyond any territorial sea to construction of any facility on the ocean floor, into what we call a contiguous zone from the 3-mile limit to the 12-mile limit.

"This amendment provides the Governor would have a veto over such matters. I do not think the Senate wants to go that far." *Ibid.*

Senator Moss agreed: "[T]his bill attempts to deal with the Territorial Sea, not the Outer Continental Shelf." *Ibid.* In response, Senator Boggs conceded that the problem should be addressed in other legislation, and he withdrew the proposed amendment. *Ibid.*

In addition, § 316(c)(1) of the Senate bill as amended on the floor of the Senate called on the National Academy of Sciences "to undertake a full

## C

To recapitulate, the "directly affecting" language in § 307(c)(1) was, by all appearances, only a modest compromise, designed to offset in part the narrower definition of the coastal zone favored by the Senate and adopted by the Conference Committee. Section 307(c)(1)'s "directly affecting" language was aimed at activities conducted or supported by federal agencies on federal lands physically situated in the coastal zone but excluded from the zone as formally defined by the Act. Consistent with this view, the same Conference Committee that wrote the "directly affecting" language rejected two provisions in the House bill that would have required precisely what respondents seek here—coordination of federally sponsored OCS activities with state coastal management and conservation programs. In light of the Conference Committee's further, systematic rejection of every other attempt to extend the reach of CZMA to the OCS, we are impelled to conclude that the 1972 Congress did not intend § 307(c)(1) to reach OCS lease sales.[15]

---

investigation of the environmental hazards attendant on offshore drilling on the Atlantic Outer Continental Shelf." S. 3507, 92d Cong., 2d Sess., § 316(c)(1) (1972), reprinted in 118 Cong. Rec. 14191 (1972). In the Senate debate several Senators voiced their opposition even to this modest venture outside the coastal zone. Senator Stevens, for example, argued that the provision was inappropriate because the OCS "is not even covered by this bill. This bill covers the territorial seas; it does not cover the Outer Continental Shelf." *Id.*, at 14180. Senator Moss added: "[S]ince the State coastal zone management programs relate only to the territorial sea, we should, therefore, be very careful of a study which extends beyond the territorial sea to encompass the Continental Shelf." *Id.*, at 14181. Again, the Conference Committee agreed; it deleted Senate § 316(c) without comment in the Conference Report. On the floor of the House Congressman Downing explained that the provision had been deleted "as nongermane." *Id.*, at 35547.

[15] Respondents rely heavily on four statements that appear in Committee Reports issued years after CZMA was enacted.

(1) A 1975 Senate Report stated: "The Committee's intent when the 1972 Act was passed was for the consistency clause to apply to Federal

# IV

## A

A broader reading of § 307(c)(1) is not compelled by the thrust of other CZMA provisions. First, it is clear beyond

leases for offshore oil and gas development, since such leases were viewed by the Committee to be within the phrase 'licenses or permits' [in § 307(c)(3)]. [The Report then discusses the proposed amendment that would insert 'lease' into § 307(c)(3).] In practical terms, this [amendment] means that the Secretary of the Interior would need to seek the certification of consistency from adjacent State governors before entering into a binding lease agreement with private oil companies." S. Rep. No. 94-277, pp. 19-20 (1975).

(2) One footnote in a 323-page House Report that accompanied the 1978 amendments to the Outer Continental Shelf Lands Act of 1953 stated:

"The committee is aware that under the [CZMA] certain OCS activities including lease sales and approval of development and production plans must comply with 'consistency' requirements as to coastal zone management plans approved by the Secretary of Commerce. Except for specific changes made by Titles IV and V of the 1977 Amendments, nothing in this Act is intended to amend, modify or repeal any provision of [CZMA]. Specifically, nothing is intended to alter procedures under that Act for consistency once a State has an approved Coastal Zone Management Plan." H. R. Rep. No. 95-590, p. 153, n. 52 (1977).

(3) A 1980 House Report stated that the 1976 CZMA § 307 amendments "did not alter Federal agency responsibility to provide States with a consistency determination related to OCS decisions which preceded issuance of leases." H. R. Rep. No. 96-1012, p. 28.

(4) A 1980 Senate Report stated that under CZMA, "[t]he Department of the Interior's activities which preced[e] lease sales . . . remain subject to the requirements of section 307(c)(1). As a result, intergovernmental coordination for purposes of OCS development commences at the earliest practicable time in the opinion of the Committee, as the Department of the Interior sets in motion a series of events which have consequences in the coastal zone." S. Rep. No. 96-783, p. 11.

In our view, these subsequent Committee interpretations of CZMA, written three or more years after CZMA was passed, are of little help in ascertaining the intent of Congress when CZMA § 307(c)(1) was passed in 1972. We note that the most relevant and unambiguous statement of the House Committee's views appeared in House §§ 312 and 313 as originally reported out of Committee and passed by the House. But those sections

peradventure that Congress believed that CZMA's purposes could be adequately effectuated without reaching federal activities conducted outside the coastal zone. Both the Senate and House bills were originally drafted, debated, and passed, with § 307(c)(1) expressly limited to federal activities *in* the coastal zone. Broad arguments about CZMA's structure, the Act's incentives for the development of state management programs, and the Act's general aspirations for state-federal cooperation thus cannot support the expansive reading of § 307(c)(1) urged by respondents.

Moreover, a careful examination of the structure of CZMA § 307 suggests that lease sales are a type of federal agency activity not intended to be covered by § 307(c)(1) at all.

Section 307(c) contains three coordinated parts. Paragraph (1) refers to activities "conduct[ed] or support[ed]" by a federal agency. Paragraph (2) covers "development project[s]" "undertake[n]" by a federal agency. Paragraph (3) deals with activities by private parties authorized by a federal agency's issuance of licenses and permits. The first two paragraphs thus reach activities in which the federal agency is itself the principal actor, the third reaches the federally approved activities of third parties. Plainly, Interior's OCS lease sales fall in the third category. Section 307(c)(1) should therefore be irrelevant to OCS lease sales, if only because drilling for oil or gas on the OCS is neither "conduct[ed]" nor "support[ed]" by a federal agency. Section

---

were emphatically rejected by the full Congress when CZMA was enacted in 1972, see *supra*, at 324–329, and Committee-proposed amendments that would have had a similar effect were rejected when the Act was amended in 1976, see *infra*, at 334–335, and n. 18. Likewise, by 1976 the Senate Committee had taken a position favoring the extension of consistency review requirements to lease sales, see *ibid.*, but that position too was subsequently rejected by the full Congress, see n. 18, *infra*. Legislative Committees' desires to reaffirm positions they have taken that were rejected by the full Congress are understandable enough, but of little help in construing the intent behind the law actually enacted.

307(c)(3), not § 307(c)(1), is the more pertinent provision. Respondents' suggestion that the consistency review requirement of § 307(c)(3) is focused only on the private applicants for permits or licenses, not federal agencies, is squarely contradicted by abundant legislative history and the language of § 307(c)(3) itself.[16]

CZMA § 307(c)(3) definitely does *not* require consistency review of OCS lease sales. As enacted in 1972, that section addressed the requirements to be imposed on federal licensees whose activities might affect the coastal zone. A federal

---

[16] Both the original § 307(c)(3) and the amended § 307(c)(3)(B), see *infra*, at 335, and n. 19, expressly address and constrain the actions of federal agencies. "No license or permit shall be granted by the Federal agency until the state . . . has concurred with the applicant's [consistency] certification . . . ." 16 U. S. C. § 1456(c)(3) (1982 ed.). "No Federal official or agency shall grant such person any license or permit for any activity . . . until [the affected] state . . . receives a copy of [the applicant's certification of consistency and concurs in the certification or is overridden by the Secretary of Commerce]." 16 U. S. C. § 1456(c)(3)(B) (1982 ed.). Moreover, in the 1976 CZMA amendment debates Members of Congress uniformly viewed § 307(c)(3) as directly concerned with the consistency obligations of federal agencies. When Congress considered adding the word "lease" to § 307(c)(3), the shared assumption was that consistency requirements in § 307(c)(3) were functionally identical to those of § 307(c)(1). One Senator was of the view that the proposed amendment would "mak[e] it clear that Outer Continental Shelf leasing is a Federal activity subject to the Federal consistency provision . . . ." 121 Cong. Rec. 23075 (1975). Another commented that the addition to § 307(c)(3) would establish that "Federal agencies must conduct their activities consistent with" applicable state management programs. *Id.*, at 23084. The Senate Report stated that the proposed § 307(c)(3) amendment, "[i]n practical terms, . . . means that the Secretary of the Interior would need to seek the certification of consistency from adjacent State governors before entering into a binding lease agreement with private oil companies." S. Rep. No. 94–277, p. 20 (1975). And the House Report stated that the amendment would establish that "the OCS leasing process is indeed a federal action that undoubtedly has the potential for affecting a state's coastal zone and, hence, must conform with approved state coastal management programs." H. R. Rep. No. 94–878, p. 37 (1976); see also *id.*, at 52–53.

agency may not issue a "license or permit" for any activity "affecting land or water uses in the coastal zone" without ascertaining that the activity is consistent with the state program or otherwise in the national interest.[17]    Each affected State with an approved management program must concur in the issuance of the license or permit; a State's refusal to do so may be overridden only if the Secretary of Commerce finds that the proposed activity is consistent with CZMA's objectives or otherwise in the interest of national security.    Significantly, § 307(c)(3) contained no mention of consistency requirements in connection with the sale of a lease.

In 1976, Congress expressly addressed—and preserved— that omission.    Specific House and Senate Committee proposals to add the word "lease" to § 307(c)(3) were rejected by the House and ultimately by the Congress as a whole.[18]    It is

---

[17] "[A]ny applicant for a required Federal license or permit to conduct an activity affecting land or water uses in the coastal zone . . . shall provide in the application to the licensing or permitting agency a certification that the proposed activity . . . will be conducted in a manner consistent with [the approved state management] program. . . .    At the earliest practicable time, the state . . . shall notify the Federal agency concerned that the state concurs with or objects to the applicant's certification. . . .    No license or permit shall be granted by the Federal agency until the state . . . has concurred with the applicant's certification . . . unless the Secretary . . . finds . . . that the activity is consistent with the objectives of [CZMA] or is otherwise necessary in the interest of national security."    16 U. S. C. § 1456(c)(3) (1982 ed.).

[18] The bills reported out of House and Senate Committees would have inserted the word "lease" in § 307(c)(3).    See H. R. Rep. No. 94–878, pp. 52–53 (1976); S. Rep. No. 94–277, pp. 19–20 (1975).    The proposal passed the Senate but was removed on the floor of the House.    122 Cong. Rec. 6128 (1976).

The Conference Committee decided not to introduce "lease" into § 307(c) (3).    Instead, the Committee created the new § 307(c)(3)(B).    The Conference Report explained:

"The conference substitute follows the Senate bill in amending the Federal consistency requirement [of] section 307(c)(3) . . . .    The Senate bill required that each Federal lease (for example, offshore oil and gas leases) had to be submitted to each state with an approved coastal zone manage-

surely not for us to add to the statute what Congress twice decided to omit.

Instead of inserting the word "lease" in § 307(c)(3), the House-Senate Conference Committee renumbered the existing § 307(c)(3) as § 307(c)(3)(A), and added a second subparagraph, § 307(c)(3)(B). Respondents apparently concede that of these two subparagraphs, only the latter is now relevant to oil and gas activities on the OCS. Brief for Respondent State of California et al. 44, and n. 76; Brief for Respondent Natural Resources Defense Council, Inc., et al. 7, n. 6. The new subparagraph § 307(c)(3)(B), however, provides only that applicants for federal licenses or permits to explore for, produce, or develop oil or gas on the OCS must first certify consistency with affected state plans.[19] Again, there is no suggestion that a lease sale by Interior requires any review of consistency with state management plans.

## B

If the distinction between a sale of a "lease" and the issuance of a permit to "explore for," "produce," or "develop" oil

---

ment program for a determination by that state as to whether or not the lease was consistent with its program. The conference substitute further elaborates on this provision and specifically applies the consistency requirement to the basic steps in the OCS leasing process—namely, the exploration, development and production plans submitted to the Secretary of the Interior. This provision will satisfy the state needs for complete information, on a timely basis, about the details of the oil industry's offshore plans." H. R. Conf. Rep. No. 94–1298, p. 30 (1976).

[19] "[A]ny person who submits to the Secretary of the Interior any plan for the exploration or development of, or production from, any area which has been leased under the Outer Continental Shelf Lands Act . . . shall, with respect to any exploration, development, or production described in such plan and affecting any land use or water use in the coastal zone . . . [certify] that each activity . . . complies with [the] state's approved management program . . . . No Federal official or agency shall grant such person any license or permit for any activity . . . until [the state concurs or] . . . the Secretary finds . . . that each activity . . . is consistent with the objectives of [CZMA] or is otherwise necessary in the interest of national security." 16 U. S. C. § 1456(c)(3)(B) (1982 ed.).

or gas seems excessively fine, it is a distinction that Congress has codified with great care. CZMA § 307(c)(3)(B) expressly refers to the Outer Continental Shelf Lands Act of 1953, 67 Stat. 462, as amended, 43 U. S. C. § 1331 *et seq.* (1976 ed., Supp. V) (OCSLA), so it is appropriate to turn to that Act for a clarification of the differences between a lease sale and the approval of a plan for "exploration," "development," or "production."

OCSLA was enacted in 1953 to authorize federal leasing of the OCS for oil and gas development. The Act was amended in 1978 to provide for the "expeditious and orderly development, subject to environmental safeguards," of resources on the OCS. 43 U. S. C. § 1332(3) (1976 ed., Supp. V). As amended, OCSLA confirms that at least since 1978 the sale of a lease has been a distinct stage of the OCS administrative process, carefully separated from the issuance of a federal license or permit to explore for, develop, or produce gas or oil on the OCS.

Before 1978, OCSLA did not define the terms "exploration," "development," or "production." But it did define a "mineral lease" to be "any form of authorization for the exploration for, or development or removal of deposits of, oil, gas, or other minerals." 43 U. S. C. § 1331(c). The pre-1978 OCSLA did not specify what, if any, rights to explore, develop, or produce were transferred to the purchaser of a lease; the Act simply stated that a lease should "contain such rental provisions and such other terms and provisions as the Secretary may prescribe at the time of offering the area for lease." 43 U. S. C. § 1337(b)(4). Thus before 1978 the sale by Interior of an OCS lease might well have engaged CZMA § 307(c)(3)(B) by including express or implied federal approval of a "plan for the exploration or development of, or production from" the leased tract.[20]

---

[20] As discussed *infra,* at 339, § 11 of the OCSLA, 43 U. S. C. § 1340 (1976 ed., Supp. V), as amended in 1978, added a requirement for the submission and separate approval of an exploration plan following the

The leases in dispute here, however, were sold in 1981. By then it was quite clear that a lease sale by Interior did *not* involve the submission or approval of "any plan for the exploration or development of, or production from" the leased tract.   Under the amended OCSLA, the purchase of a lease entitles the purchaser only to priority over other interested parties in submitting for federal approval a plan for exploration, production, or development.   Actual submission and approval or disapproval of such plans occur separately and later.

Since 1978 there have been four distinct statutory stages to developing an offshore oil well: (1) formulation of a 5-year leasing plan by the Department of the Interior; (2) lease sales; (3) exploration by the lessees; (4) development and production.   Each stage involves separate regulatory review that may, but need not, conclude in the transfer to lease purchasers of rights to conduct additional activities on the OCS. And each stage includes specific requirements for consultation with Congress, between federal agencies, or with the States.   Formal review of consistency with state coastal management plans is expressly reserved for the last two stages.

*(1) Preparation of a leasing program.*   The first stage of OCS planning is the creation of a leasing program.   Interior is required to prepare a 5-year schedule of proposed OCS lease sales.   43 U. S. C. § 1344 (1976 ed., Supp. V).   During the preparation of that program Interior must solicit comments from interested federal agencies and the Governors of affected States, and must respond in writing to all comments

purchase of a lease.   However, that section made the requirements prospective only, to come into force 90 days after September 18, 1978. 43 U. S. C. § 1340(b) (1976 ed., Supp. V).   Similarly, the 1978 OCSLA amendments required oil or gas leases to provide that development and production be conducted only in accordance with a subsequently submitted and approved plan, but extended this requirement only to leases issued after September 18, 1978.   43 U. S. C. § 1351(b) (1976 ed., Supp. V).

or requests received from the State Governors. 43 U. S. C. § 1344(c) (1976 ed., Supp. V). The proposed leasing program is then submitted to the President and Congress, together with comments received by the Secretary from the Governor of the affected State. 43 U. S. C. § 1344(d)(2) (1976 ed., Supp. V).

Plainly, prospective lease purchasers acquire no rights to explore, produce, or develop at this first stage of OCSLA planning, and consistency review provisions of CZMA § 307(c)(3)(B) are therefore not engaged. There is also no suggestion that CZMA § 307(c)(1) consistency requirements operate here, though we note that preparation and submission to Congress of the leasing program could readily be characterized as "initiat[ing] a [s]eries of [e]vents of [c]oastal [m]anagement [c]onsequence." Brief for Respondent State of California et al. 10.

*(2) Lease sales.* The second stage of OCS planning—the stage in dispute here—involves the solicitation of bids and the issuance of offshore leases. 43 U. S. C. § 1337(a) (1976 ed., Supp. V). Requirements of the National Environmental Policy Act and the Endangered Species Act must be met first. The Governor of any affected State is given a formal opportunity to submit recommendations regarding the "size, timing, or location" of a proposed lease sale. 43 U. S. C. § 1345(a) (1976 ed., Supp. V). Interior is required to accept these recommendations if it determines they strike a reasonable balance between the national interest and the well-being of the citizens of the affected State. 43 U. S. C. § 1345 (c) (1976 ed., Supp. V). Local governments are also permitted to submit recommendations, and the Secretary "may" accept these. 43 U. S. C. §§ 1345(a), (c) (1976 ed., Supp. V). The Secretary may then proceed with the actual lease sale. Lease purchasers acquire the right to conduct only limited "preliminary" activities on the OCS—geophysical and other surveys that do not involve seabed penetrations

greater than 300 feet and that do not result in any significant environmental impacts. 30 CFR § 250.34–1 (1982).

Again, there is no suggestion that these activities in themselves "directly affect" the coastal zone. But by purchasing a lease, lessees acquire no right to do anything more. Under the plain language of OCSLA, the purchase of a lease entails no right to proceed with full exploration, development, or production that might trigger CZMA § 307(c)(3)(B); the lessee acquires only a priority in submitting plans to conduct those activities. If these plans, when ultimately submitted, are disapproved, no further exploration or development is permitted.

*(3) Exploration.* The third stage of OCS planning involves review of more extensive exploration plans submitted to Interior by lessees. 43 U. S. C. § 1340 (1976 ed., Supp. V). Exploration may not proceed until an exploration plan has been approved. A lessee's plan must include a certification that the proposed activities comply with any applicable state management program developed under CZMA. OCSLA expressly provides for federal disapproval of a plan that is not consistent with an applicable state management plan unless the Secretary of Commerce finds that the plan is consistent with CZMA goals or in the interest of national security. 43 U. S. C. § 1340(c)(2) (1976 ed., Supp. V). The plan must also be disapproved if it would "probably cause serious harm or damage . . . to the marine, coastal, or human environment . . . ." 43 U. S. C. §§ 1334(a)(2)(A)(i), 1340(c)(1) (1976 ed., Supp. V). If a plan is disapproved for the latter reason, the Secretary may "cancel such lease and the lessee shall be entitled to compensation . . . ." 43 U. S. C. § 1340(c)(1) (1976 ed., Supp. V).

There is, of course, no question that CZMA consistency review requirements operate here. CZMA § 307(c)(3)(B) expressly applies, and as noted, OCSLA itself refers to the applicable CZMA provision.

*(4) Development and production.*  The fourth and final stage is development and production.  43 U. S. C. § 1351 (1976 ed., Supp. V).  The lessee must submit another plan to Interior.  The Secretary must forward the plan to the Governor of any affected State and, on request, to the local governments of affected States, for comment and review.  43 U. S. C. §§ 1345(a), 1351(a)(3) (1976 ed., Supp. V).  Again, the Governor's recommendations must be accepted, and the local governments' may be accepted, if they strike a reasonable balance between local and national interests.  Reasons for accepting or rejecting a Governor's recommendations must be communicated in writing to the Governor.  43 U. S. C. § 1345(c) (1976 ed., Supp. V).  In addition, the development and production plan must be consistent with the applicable state coastal management program.  The State can veto the plan as "inconsistent," and the veto can be overridden only by the Secretary of Commerce.  43 U. S. C. § 1351(d) (1976 ed., Supp. V).  A plan may also be disapproved if it would "probably cause serious harm or damage . . . to the marine, coastal or human environments."  43 U. S. C. § 1351(h)(1)(D)(i) (1976 ed., Supp. V).  If a plan is disapproved for the latter reason, the lease may again be canceled and the lessee is entitled to compensation.  43 U. S. C. § 1351(h)(2)(C) (1976 ed., Supp. V).

Once again, the applicability of CZMA to this fourth stage of OCS planning is not in doubt.  CZMA § 307(c)(3)(B) applies by its own terms, and is also expressly invoked by OCSLA.

Congress has thus taken pains to separate the various federal decisions involved in formulating a leasing program, conducting lease sales, authorizing exploration, and allowing development and production.  Since 1978, the purchase of an OCS lease, standing alone, entails no right to explore for, develop, or produce oil and gas resources on the OCS.  The first two stages are not subject to consistency review; in-

stead, input from State Governors and local governments is solicited by the Secretary of the Interior. The last two stages invite further input for Governors or local governments, but also require formal consistency review. States with approved CZMA plans retain considerable authority to veto inconsistent exploration or development and production plans put forward in those latter stages.[21] The stated reason for this four-part division was to forestall premature litigation regarding adverse environmental effects that all agree will flow, if at all, only from the latter stages of OCS exploration and production.[22]

---

[21] OCSLA contains a saving clause that provides: "Except as otherwise expressly provided in this chapter, nothing in this chapter shall be construed to amend, modify, or repeal any provision of [CZMA]." 43 U. S. C. § 1866(a) (1976 ed., Supp. V). Our analysis of CZMA § 307(c)(1) is entirely consistent with this clause. A narrow construction of "directly affecting" is compelled by CZMA's legislative history, standing alone. It is reinforced by CZMA § 307(c)(3), which expressly addresses the consistency review requirements to be imposed on OCS oil and gas programs. Section 307(c)(3) provides for consistency review prior to exploration, development, and production, not prior to lease sales. CZMA itself invokes OCSLA, so it is appropriate to look to that Act for the distinction between lease sales on the one hand, and exploration, development, and production permits on the other. OCSLA confirms that a lease sale is a separate, distinct stage of OCS planning, not to be confused with exploration, development, or production. The 1978 OCSLA amendments are relevant not because they change any part of CZMA, but because they change, or at least substantially clarify, the rights transferred by Interior when a lease is sold.

[22] The House Report accompanying the 1978 OCSLA amendments explained:

"[The consistency review provision imposed at the *production* stage] is intended to provide the mechanism for review and evaluation of, and decision on, development and production in a leased area, after consultation and coordination with all affected parties.

"The committee considers this one of the most important provisions of the 1977 amendments. It provides a means to separate the Federal decision to allow private industry to explore for oil and gas from the Federal decision to allow development and production to proceed if the lessee finds

## C

Having examined the coordinated provisions of CZMA § 307(c)(3) and OCSLA we return to CZMA § 307(c)(1).

As we have noted, the logical paragraph to examine in connection with a lease sale is not § 307(c)(1), but § 307(c)(3). Nevertheless, even if OCS lease sales are viewed as involving an OCS activity "conduct[ed]" or "support[ed]" by a federal agency, lease sales can no longer aptly be characterized as "directly affecting" the coastal zone. Since 1978 the sale of a lease grants the lessee the right to conduct only very limited, "preliminary activities" on the OCS. It does not authorize full-scale exploration, development, or production. Those activities may not begin until separate federal approval has been obtained, and approval may be denied on several grounds. If approval is denied, the lease may then be canceled, with or without the payment of compensation to the lessee. In these circumstances, the possible effects on the coastal zone that may eventually result from the sale of a lease cannot be termed "direct."

It is argued, nonetheless, that a lease sale is a crucial step. Large sums of money change hands, and the sale may therefore generate momentum that makes eventual exploration, development, and production inevitable. On the other side, it is argued that consistency review at the lease sale stage is at best inefficient, and at worst impossible: Leases are sold before it is certain if, where, or how exploration will actually occur.

The choice between these two policy arguments is not ours to make; it has already been made by Congress. In the 1978 OCSLA amendments Congress decided that the better course is to postpone consistency review until the two later

---

oil and gas. The failure to have such a mechanism in the past has led to extensive litigation prior to lease sales, when onshore and environmental impacts of production activity are not yet known." H. R. Rep. No. 95–590, p. 164 (1977).

stages of OCS planning, and to rely on less formal input from State Governors and local governments in the two earlier ones. It is not for us to negate the lengthy, detailed, and coordinated provisions of CZMA § 307(c)(3)(B), and OCSLA, 43 U. S. C. §§ 1344–1346 and 1351 (1976 ed., Supp. V), by a superficially plausible but ultimately unsupportable construction of two words in CZMA § 307(c)(1).

## V

Collaboration among state and federal agencies is certainly preferable to confrontation in or out of the courts. In view of the substantial consistency requirements imposed at the exploration, development, and production stages of OCS planning, Interior, as well as private bidders on OCS leases, might be well advised to ensure in advance that anticipated OCS operations can be conducted harmoniously with state coastal management programs.[23] But our review of the history of CZMA § 307(c)(1), and the coordinated structures of the amended CZMA and OCSLA, persuade us that Congress did not intend § 307(c)(1) to mandate consistency review at the lease sale stage.

Accordingly, the decision of the Court of Appeals for the Ninth Circuit is reversed insofar as it requires petitioners to conduct consistency review pursuant to CZMA § 307(c)(1) before proceeding with Lease Sale No. 53.

*It is so ordered.*

---

[23] In his comments regarding the House's 1976 refusal to add the word "lease" to CZMA § 307(c)(3), Congressman Murphy noted that "even if an organization had a lease it could not do much with it because the licenses and permits are required to deal with the development of oil on the Continental Shelf." 122 Cong. Rec. 6128 (1976).

The California Coastal Commission is also well aware of its power to demand consistency at later stages in OCS planning. In voicing its objections to the sale of the 31 disputed tracts the Commission warned: "Any attempt to explore or develop these tracts will face the strong possibility of an objection to a consistency certification of the Plan of Exploration or Development by the Commission." App. 79.

JUSTICE STEVENS, with whom JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE BLACKMUN join, dissenting.

In these cases, the State of California is attempting to enforce a federal statutory right. Its coastal zone management program was approved by the Federal Government pursuant to a statute enacted in 1972. In § 307(c)(1) of that statute, the Coastal Zone Management Act (CZMA), the Federal Government made a promise to California:

> "Each Federal agency conducting or supporting activities directly affecting the coastal zone shall conduct or support those activities in a manner which is, to the maximum extent practicable, consistent with approved state management programs." 86 Stat. 1285, 16 U. S. C. § 1456(c)(1) (1982 ed.).

The question in these cases is whether the Secretary of the Interior was conducting an activity directly affecting the California Coastal Zone when he sold oil and gas leases in the Pacific Ocean area immediately adjacent to that zone. One would think that this question could be easily answered simply by reference to a question of fact—does this sale of leases directly affect the coastal zone? The District Court made a finding that it did, which the Court of Appeals affirmed, and which is not disturbed by the Court. Based on a straightforward reading of the statute, one would think that that would be the end of the cases.

The Court reaches a contrary conclusion, however, based on either or both of these two theories: (1) § 307(c)(1) only applies to federal activities that take place within the coastal zone itself or in a federal enclave within the zone—it is wholly inapplicable to federal activities on the Outer Continental Shelf (OCS) no matter how seriously they may affect the coastal zone; (2) even if the sale of oil leases by the Secretary of the Interior would have been covered by § 307(c)(1) when the CZMA was enacted in 1972, amendments to an entirely

different statute adopted in 1978 mean that the leases cannot directly affect the coastal zone notwithstanding the fact that those amendments merely imposed additional obligations on private lessees and did not purport to cut back on any obligation previously imposed on federal agencies.

The Court's first theory is refuted by the plain language of the 1972 Act, its legislative history, the basic purpose of the Act, and the findings of the District Court. The Court's second theory, which looks at post-1972 legislative developments, is simply overwhelmed by a series of unambiguous legislative pronouncements that consistently belie the Court's interpretation of the intent of Congress.

## I

Because there is so much material refuting the Court's reading of the 1972 Act, an index of what is to follow may be useful. I shall first note that the plain language of § 307(c)(1) draws no distinction between activities that take place outside the coastal zone and those that occur within the zone; it is the effect of the activities rather than their location that is relevant. I shall then review the legislative history which demonstrates that the words "directly affecting" were included in the section to make sure that the statute covered activities occurring outside the coastal zone if they are the functional equivalent of activities occurring within the zone. I shall then identify some of the statutory provisions indicating that Congress intended to require long-range, advance planning. I shall conclude Part I with a description of the findings that bring these cases squarely within the congressional purpose.

### Plain Language

In statutory construction cases, the Court generally begins its analysis by noting that "[t]he starting point in every case involving construction of a statute is the language itself." *E. g.*, *Watt* v. *Alaska*, 451 U. S. 259, 265 (1981). Not much

is said, however, about the plain language of § 307(c)(1) in the opinion of the Court, and no wonder. The words "activities directly affecting the coastal zone" make it clear that § 307(c)(1) applies to activities that take place outside the zone itself as well as to activities conducted within the zone. There are federal enclaves inside the boundaries of the coastal zone that, as a matter of statutory definition, are excluded from the zone itself.[1] Moreover, the ocean areas on the OCS that are adjacent to, and seaward of, the coastal zone are subject to the exclusive jurisdiction of the Federal Government.[2] Quite plainly, the federal activities that may directly affect the coastal zone can be conducted in the zone itself, in a federal enclave, or in an adjacent federal area. The plain meaning of the words thus indicates that the words "directly affecting" were intended to enlarge the coverage of § 307(c)(1) to encompass activities conducted outside as well as inside the zone. In light of this language it is hard to see how the Court can hold, as it does, that federal activities in the OCS can never fall within the statute because they are outside the outer boundaries of the coastal zone.

---

[1] Section 304(a) defines the coastal zone as follows:

"(a) The term 'coastal zone' means the coastal waters (including the lands therein and thereunder) and the adjacent shorelands (including the waters therein and thereunder), strongly influenced by each other and in proximity to the shorelines of the several coastal states, and includes islands, transitional and intertidal areas, salt marshes, wetlands, and beaches. The zone extends, in Great Lakes waters, to the international boundary between the United States and Canada and, in other areas, seaward to the outer limit of the United States territorial sea. The zone extends inland from the shorelines only to the extent necessary to control shorelands, the uses of which have a direct and significant impact on the coastal waters. Excluded from the coastal zone are lands the use of which is by law subject solely to the discretion of or which is held in trust by the Federal Government, its officers or agents." 86 Stat. 1281, as amended, 16 U. S. C. § 1453(1) (1982 ed.).

[2] See *United States* v. *Maine*, 420 U. S. 515 (1975); 43 U. S. C. §§ 1302, 1332(1) (1976 ed. and Supp. V).

*Legislative History*

The plain meaning of the Act is confirmed by its legislative history. Both the House and the Senate versions of the CZMA originally applied only to federal agencies conducting "activities in the coastal zone."[3] At the same time, Congress clearly recognized that the most fundamental purpose of the CZMA was "to preserve, protect, develop, and where possible, to restore or enhance, the resources of the Nation's coastal zone for this and succeeding generations." 86 Stat. 1281, 16 U. S. C. § 1452(1) (1982 ed.). In writing the versions of the CZMA that went to conference, both Houses stated that their purpose was to prevent adverse *effects* on the coastal zone.[4] Yet it plainly would have been impossible to achieve this purpose without considering activities outside of the zone which nevertheless could have a devastating impact on it—activities such as those that led to the 1969 Santa

---

[3] See H. R. 14146, 92d Cong., 2d Sess., § 307(c)(1) (1972), reprinted in 118 Cong. Rec. 26502 (1972) ("Each Federal agency conducting or supporting activities in the coastal zone shall conduct or support those activities in a manner which is, to the maximum extent practicable, consistent with approved state management programs"); S. 3507, 92d Cong., 2d Sess., § 314(b)(1) (1972), reprinted in 118 Cong. Rec. 14190 (1972) ("All Federal agencies conducting or supporting activities in the coastal zone shall administer their programs consistent with approved State management programs except in cases of overriding national interest as determined by the President").

[4] The Senate's version stated that the purpose of a state coastal zone management plan must be "to minimize direct, significant, and adverse impact on the coastal waters . . . ." S. 3507, 92d Cong., 2d Sess., § 304(g) (1972), reprinted in 118 Cong. Rec. 14188 (1972). Plans were required to state "what shall constitute permissible land and water uses within the coastal zone so as to prevent such uses which have a direct, significant, and adverse impact on the coastal waters . . . ." § 305(b)(2), reprinted in 118 Cong. Rec. 14188 (1972). The House bill contained similar language, see H. R. 14146, 92d Cong., 2d Sess., § 305(b) (1972), reprinted in 118 Cong. Rec. 26501 (1972). See also S. Rep. No. 92–753, p. 10 (1972).

Barbara, Cal., oil spill, which occurred in the OCS but which had a devastating impact on the adjacent California coast.[5] When the Conferees adopted the definition of "coastal zone" that excluded federal enclaves, they recognized the need to expand the description of federal activities that should be conducted in a manner that is consistent with an approved state program. The substitution of the words "directly affecting" for the word "in" accomplished this purpose. Thus, if an activity outside the zone has the same kind of effect on the zone as if it had been conducted in the zone, it is covered by § 307(c)(1).[6]

The Court's position seems to be that since neither the Senate nor House versions covered federal activities outside of the coastal zone, the bill that emerged from the Conference Committee could not have either. See *ante*, at 322–324. To construe the Conference substitute otherwise would be to find a "surprising, unexplained, and subsequently unnoticed expansion in the scope of § 307(c)(1)," *ante*, at 322. Not only does that construction ignore the "directly affecting" language used by Congress, but it rests on a demonstrably incorrect assumption as to the scope of the earlier versions of the CZMA.

---

[5] The Santa Barbara incident was referred to on several occasions during the consideration of the CZMA. See 118 Cong. Rec. 14180 (1972) (remarks of Sen. Boggs); *id.*, at 26484 (remarks of Rep. Anderson); *id.*, at 26495 (same); *ibid.* (remarks of Rep. Teague); *id.*, at 35550 (remarks of Rep. Anderson).

[6] The Court seems to read this history as indicating that only federal activities in the coastal zone or on federal enclaves may directly affect the zone. See *ante*, at 323–324. If that were a correct reading, § 307(c)(1) would have no application at all in the ocean area adjacent to the coastal zone. None of the litigants has advanced such an improbable construction of "directly affecting." It is perfectly obvious that when Congress adopted language that excluded federal enclaves from the zone, it realized that activities which are conducted outside the zone itself can have the same kind of effect within the zone as an activity conducted in the zone. An oil well adjacent to the zone will affect the zone in precisely the same way whether it is in a federal enclave or in federal water just outside the zone.

The House version of the CZMA clearly recognized that activities outside the coastal zone could have a critical impact upon the coastal zone, and therefore had to be covered by management plans. It defined the coastal zone to extend inland to areas which could have an impact on it, see H. R. 14146, 92d Cong., 2d Sess., § 304(a) (1972), reprinted in 118 Cong. Rec. 26501 (1972), in order to enable the CZMA to achieve "its basic underlying purpose, that is the management and the protection of the coastal waters. It would not be possible to accomplish that purpose without to some degree extending the coverage to the shorelands which have an impact on those waters." H. R. Rep. No. 92–1049, p. 14 (1972). The House bill did not extend the zone seaward because it instead required the Secretary of Commerce to develop a management program for activities on the OCS that was consistent with the management program of the adjacent State. H. R. 14146, 92d Cong., 2d Sess., § 313 (1972), reprinted in 118 Cong. Rec. 26503 (1972); H. R. Rep. No. 92–1049, p. 23 (1972).[7] Section 313 was thus specifically premised on the recognition that federal activities in the OCS, particularly the sale of oil and gas leases, could have a direct impact on the coastal zone.[8] The House further recog-

---

[7] The House version provided that the Secretary's management program "shall be coordinated with the [adjacent] coastal state involved." H. R. 14146, 92d Cong., 2d Sess., § 313(b) (1972), reprinted in 118 Cong. Rec 26503 (1972). It further provided: "The Secretary shall, to the maximum extent practicable, apply the program developed pursuant to this section to waters which are adjacent to specific areas in the coastal zone which have been designated by the states for the purpose of preserving or restoring such areas for their conservation, recreational, ecological, or esthetic values." § 313(c), reprinted in 118 Cong. Rec. 26503 (1972).

[8] "Mr. Chairman, of particular interest to me is a subsection, which I authored, designed to protect State-established coastal sanctuaries, such as exists off California, from federally authorized development.

"The State of California in 1955 created five marine sanctuaries to protect the beaches from oil spills. In 1963, two more sanctuaries were created.

"These State-established sanctuaries, which extend from the coastline

nized the need to regulate federal OCS activities to protect the coastal zone in § 312 of its bill, which provided for the expansion of coastal zone marine sanctuaries established by state management plans into the OCS, in order to fully protect the coastal zone.[9]   The House showed its concern about the impact of federal activities in the OCS on the coastal zone by rejecting an amendment to § 312 which would have made it permissive rather than mandatory for the Federal Government to establish sanctuaries in areas adjacent to state sanctuaries, and another amendment that would have deleted § 312 altogether.   See 118 Cong. Rec. 26495–26496 (1972).

---

seaward to 3 miles, account for nearly a fourth of the entire California coast.

"However, the Federal Government has jurisdiction outside the State area, from 3 miles to 12 miles at sea.   All too often, the Federal Government has allowed development and drilling to the detriment of the State program.

"A case in point is Santa Barbara where California established a marine sanctuary banning the drilling of oil in the area under State authority.

"Yet outside the sanctuary—in the federally controlled area—the Federal Government authorized drilling which resulted in the January 1969 blowout.   This dramatically illustrated the point that oil spills do not respect legal jurisdictional lines.

"In order to protect the desires of the citizens of the coastal States who wish to establish marine sanctuaries, I offered a provision which 'requires that the Secretary of Commerce shall, to the maximum extent practicable, apply the coastal zone program to waters immediately adjacent to the coastal waters of a State, which the State has designated for specific preservation purposes.'   The Merchant Marine and Fisheries Committee approved this provision." *Id.*, at 26484 (remarks of Rep. Anderson).

[9] "When an estuarine sanctuary is established by a coastal state . . . whether or not Federal funds have been made available for a part of the costs of acquisition, development, and operation, the Secretary, at the request of the state concerned, and after consultation with interested Federal departments and agencies and other interested parties, may extend the established estuarine sanctuary seaward beyond the coastal zone, to the extent necessary to effectuate the purposes for which the estuarine sanctuary was established."   H. R. 14146, 92d Cong., 2d Sess., § 312(b) (1972), reprinted in 118 Cong. Rec. 26503 (1972).

Thus it is plainly evident that the House did wish to protect the integrity of state coastal zone management with respect to federal activities in the OCS.

The Senate shared the House's concern that state management plans must apply to federal activities in areas adjacent to the coastal zone. The Senate Report on its version of the CZMA stated that its version was derived from a bill it had reported favorably during the previous year, S. 582.[10]   In particular, the 1971 Senate version of the CZMA used exactly the same language in framing the consistency obligation as did the 1972 version.[11]   The Report on the 1971 bill con-

---

[10] "During the first session of the 92d Congress, the Subcommittee on Oceans and Atmosphere, formerly the Subcommittee on Oceanography, held an additional three days of hearings during May 1971.   Fifteen witnesses were heard and 39 new letters, articles and publications were received for the record, which was published by the Committee as Serial No. 92–15.

"In the ensuing period, S. 582 was redrafted by the Subcommittee, incorporating additional ideas from S. 638 and S. 992, which the Subcommittee felt strengthened the bill.   The Subcommittee also drew substantially upon ideas propounded by the Council on Environmental Quality, whose assistance was invaluable.   The Subcommittee reported the bill favorably to the Committee on Commerce on August 4, 1971, and on September 30, 1971 the Committee ordered the bill reported favorably with amendments.

"On March 14, 1972, at the request of Senator Hollings, S. 582 was recommitted to the Committee.   Changes were made in the bill so as to clear up conflicting matters of jurisdiction, to place limitations on the coastal zone, and to broaden the participation of local governments, interstate agencies and areawide agencies in the preparation and operation of management programs.   Additional changes were made to make the bill compatible with proposed land use policy legislation as proposed by the Administration.   (See S. 992)   Then, on Tuesday, April 11, 1972, the Committee ordered S. 3507 be reported favorably as an original bill."   S. Rep. No. 92–753, p. 7 (1972).

[11] The 1971 bill stated: "All Federal agencies conducting or supporting activities in the coastal and estuarine zone shall administer their programs consistent with approved State management programs except in cases of

strued this language to extend the consistency obligation to federal activities in waters outside of the coastal zone which functionally interact with the zone:

> "[A]ny lands or waters under Federal jurisdiction and control, where the administering Federal agency determines them to have a functional interrelationship from an economic, social, or geographic standpoint with lands and waters within the territorial sea, should be administered consistent with approved State management programs except in cases of overriding national interest as determined by the President." S. Rep. No. 92–526, p. 20 (1971).[12]

Since the 1972 Senate CZMA used identical language to describe the consistency requirement, and nothing in the 1972 Senate Report indicates that this language should be construed differently than the 1971 language, it follows that the 1972 Senate version placed a consistency obligation upon federal activities in the OCS which affect the coastal zone.

Thus, the Court is simply wrong to say that both versions of the CZMA sent to conference displayed no interest in regulating federal activities occurring outside of the exterior boundaries of the coastal zone. The Conferees' adoption of the "directly affecting" language merely clarified the scope

---

overriding national interest as determined by the President." S. 582, 92d Cong., 1st Sess., § 313(b)(1) (1971), reprinted in S. Rep. No. 92–526, p. 7 (1971). The 1972 version is identical, except that what the 1971 version called the "coastal and estuarine zone" the 1972 version shortened to the "coastal zone."

[12] The Report repeated itself, apparently for emphasis: "As noted previously, it is intended that any lands or waters under Federal jurisdiction and control, within or adjacent to the coastal and estuarine zone, where the administering Federal agency determines them to have a functional interrelationship from an economic, social, or geographic standpoint with lands and waters within the coastal and estuarine zone, should be administered consistent with approved State management programs." *Id.*, at 30.

of the consistency obligation. The House surrendered the requirements that the Federal Government develop its own management plan for OCS activities and that federal lands within the coastal zone be included in the zone, but in return ensured that any federal activities "directly affecting" the coastal zone would be subject to the consistency requirement of § 307(c)(1). The only explanations of this compromise to be found in the legislative history can be briefly set out. The Conferees wrote:

> "[A]s to Federal agencies involved in *any* activities directly affecting the state coastal zone and any Federal participation in development projects in the coastal zone, *the Federal agencies must make certain that their activities are to the maximum extent practicable consistent with approved state management programs.* In addition, similar consideration of state management programs must be given in the process of issuing Federal licenses or permits for activities affecting State coastal zones. The Conferees also adopted language which would make certain that there is no intent in this legislation to change Federal or state jurisdiction or rights in specified fields, including submerged lands." H. R. Conf. Rep. No. 92–1544, p. 14 (1972) (emphasis supplied).

Senator Hollings, the floor manager of the CZMA, said when he presented the Conference Report to the Senate: "The bill provides States with national policy goals to control those land uses which have a direct and significant impact upon coastal waters." 118 Cong. Rec. 35459 (1972). That is the entire history of the Conference compromise. There is not the slightest indication that Congress intended to adopt the strange rule which the Court announces today—that OCS leasing cannot be subject to consistency requirements. To the contrary, these statements indicate that *any* federal ac-

tivity is covered as long as it directly affects the coastal zone. The Conferees' reference to federal rights in "submerged lands" further indicates that it recognized that the statute could be applied to the OCS. The inescapable conclusion is that §§ 312 and 313 were deleted precisely because § 307(c)(1) had been strengthened so as to protect the coastal zone from federal OCS activities, which obviated the need for these sections. There is no indication whatsoever that the deletion occurred because Congress rejected any application of state management plans to federal activities in the OCS.[13]

_____

[13] There is not a word in the Conference Report on the CZMA indicating that the Conferees rejected the concept that the coastal zone be protected from federal OCS activities through consistency review. The Court relies on Representative Anderson's statement concerning the Conference Report, *ante*, at 328, but in fact he spoke only with reference to the "provision [that] would have required the Secretary to apply the coastal zone program to waters immediately adjacent to the coastal waters of a State, which that State has designated for specific preservation purposes." 118 Cong. Rec. 35549–35550 (1972). His remarks did not concern the scope of § 307(c)(1). Moreover, with respect to § 313 the Conferees indicated that it was deleted only because "the provisions relating thereto did not prescribe sufficient standards or criteria [for coastal management] and would create potential conflicts with legislation already in existence concerning Continental Shelf resources." H. R. Conf. Rep. No. 92–1544, p. 15 (1972). As for § 312, the objection to it was not that it applied state management plans to the OCS; in fact it did not. The objections were of a much different nature— concern that § 312 might automatically foreclose OCS development without judicial or administrative review, see 118 Cong. Rec. 26495 (1972) (remarks of Rep. Clark), and that it duplicated existing programs which already achieved the same purpose. *Id.*, at 26495–26496 (remarks of Rep. Kyl). All the Conferees said about their reasons for rejecting § 312 was: "[T]he need for such provisions appears to be rather remote and could cause problems since they would extend beyond the territorial limits of the United States." H. R. Conf. Rep. No. 92–1544, pp. 14–15 (1972).

The Court also relies on the Senate's rejection of an amendment which would have required the Federal Government to submit leasing proposals to affected States for approval, and the Conferees' rejection of a provision of the Senate version of the CZMA providing for a study of the environmental hazards attendant to drilling in the Atlantic OCS. *Ante*, at 329–330,

In sum, the substitution of the words "directly affecting the coastal zone" for the words "in the coastal zone" plainly effectuated the congressional intent to cover activities outside the zone that are the functional equivalent of activities within the zone, thereby addressing the concern of both Houses that the consistency requirement extend to federal OCS activities.   There is simply no evidence that § 307(c)(1) was not intended to reach federal OCS activities which directly affect the coastal zone.

*Purposes of the CZMA*

An examination of the underlying purposes of the CZMA confirms that the most obvious reading of § 307(c)(1), which

n. 14.   As for the Senate amendment, the objection to it had nothing to do with whether consistency obligations applied to federal OCS activity.   The objections centered around the veto it gave to the States.   Senator Hollings said: "This amendment provides the Governor would have a veto over such matters.   I do not think the Senate wants to go that far.   The amendment comes without public hearing and full consideration, which we have not had the benefit of." 118 Cong. Rec. 14184 (1972).   Then, Senator Moss pointed out that a study of this problem was then underway in the Committee on Interior and Insular Affairs.   *Ibid.*   It was for that reason, and that reason alone, that the sponsor of the amendment voluntarily withdrew it: "I am happy that these hearings and studies are continuing.   I believe and hope they will shed full light on this important subject so that the Senate can give the fullest consideration in light of these hearings and further studies.   Mr. President, with the chairman's permission, I ask unanimous consent to withdraw the amendment." *Ibid.* (remarks of Sen. Boggs).   As for the study in the Senate version, S. 3507, 92d Cong., 2d Sess., § 316(c)(1) (1972), reprinted in 118 Cong. Rec. 14191 (1972), it was deleted in conference for no other reason than that it was nongermane. *Id.*, at 35547 (remarks of Rep. Downing).   Moreover, the Court misstates the objections to this provision.   Senators Stevens and Moss objected only because they thought the study should also produce recommendations as to how to eliminate the environmental hazards posed by OCS drilling.   See *id.*, at 14180 (remarks of Sen. Stevens).   The sponsor, Senator Pell, offered an amendment providing for such recommendations, and then both Senators withdrew their objections to the study.   See *id.*, at 14181 (remarks of Sen. Stevens); *id.*, at 14181–14182 (remarks of Sen. Moss).

would apply its consistency obligation to federal OCS leasing that directly affects the coastal zone, is fully justified.

The congressional findings in § 302 of the CZMA first identify the "national interest in the effective management, beneficial use, protection, and development of the coastal zone," 86 Stat. 1280, 16 U. S. C. § 1451(a) (1982 ed.), and then recite the various conflicting demands on the valuable resources in such zones, including those occasioned by the "extraction of mineral resources and fossil fuels." Congress found that special natural and scenic characteristics are "being damaged by ill-planned development" and that "present state and local institutional arrangements for planning and regulating land and water uses in such areas are inadequate." §§ 1451(g) and (h). Finally, Congress found that the effective protection of resources in the coastal zone required the development of "land and water use programs for the coastal zone, including unified policies, criteria, standards, methods, and processes for dealing with land and water use decisions of more than local significance." § 1451(i). The declaration of national policy in § 303 of the 1972 CZMA unambiguously exhorted "all Federal agencies engaged in programs affecting the coastal zone to cooperate and participate with state and local governments and regional agencies in effectuating the purposes of this title." 86 Stat. 1281. The policy declaration concluded:

> "With respect to implementation of such management programs, it is the national policy to encourage cooperation among the various state and regional agencies including establishment of interstate and regional agreements, cooperative procedures, and joint action particularly regarding environmental problems." *Ibid.*

These provisions surely indicate a congressional preference for long-range planning and for close cooperation between federal and state agencies in conducting or supporting activi-

ties that directly affect the coastal zone.[14]    Statutes should be construed in a manner consistent with their underlying policies and purposes.   *E. g.*, *FBI* v. *Abramson*, 456 U. S. 615, 625, and n. 7 (1982); *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1, 18–19 (1981); *Philbrook* v. *Glodgett*, 421 U. S. 707, 713 (1975).   By applying the consistency obligation to the first critical step in OCS development, the decision to lease, the statute is construed in a manner consistent with its underlying purpose.

The majority's construction of § 307(c)(1) is squarely at odds with this purpose.   Orderly, long-range, cooperative planning dictates that the consistency requirement must apply to OCS leasing decisions.   The sale of OCS leases involves the expenditure of millions of dollars.[15]    If exploration and development of the leased tracts cannot be squared with the requirements of the CZMA, it would be in everyone's interest to determine that as early as possible.   On the other

---

[14] Construing the CZMA to begin federal-state cooperation at the OCS leasing stage enhances such long-range planning and maximizes cooperation.   Indeed, the 1980 House Report on the CZMA stated that Congress intended consistency review to apply at the OCS leasing stage for precisely this reason:

"The benefits of this [construction] are significant.   First, it fosters consultation between Federal and State agencies at the earliest practicable time.   This, in turn, enhances the ability of the States to plan for and manage the coastal zone effects which are directly linked to Federal commitment of resources for Federal activities likely to lead to results inconsistent with the requirements of approved State programs.

"Secondly, broad opportunities for States to influence Federal activities enhances the incentive of the consistency provisions, thereby reinforcing voluntary State participation in the national program.   Finally, an expansive interpretation of the threshold test is compatible with the amendment to section 303 calling for Federal agencies and others to participate and cooperate in carrying out the purposes of the act."   H. R. Rep. No. 96–1012, pp. 34–35 (1980).

[15] In the lease sale at issue in this case, $220 million was bid on the disputed tracts.

hand, if exploration and development of the tracts would be consistent with the state management plan, a preleasing consistency determination would provide assurances to prospective purchasers and hence enhance the value of the tracts to the Federal Government and, concomitantly, the public. Advance planning can only minimize the risk of either loss or inconsistency that may ultimately confront all interested parties.[16]   It is directly contrary to the legislative scheme not to make a consistency determination at the earliest possible point.[17]   It is especially incongruous since the Court agrees that all federal activity "in" the coastal zone is subject to consistency review.   If activity in the OCS directly affects the

---

[16] Petitioners complain that at the leasing stage there may be inadequate information on which to base a consistency determination.   The applicable regulations dispose of this objection.   While they require a consistency determination at the earliest possible time, the determination need not be made until sufficient information is developed to make a consistency determination practicable.   See 15 CFR § 930.34(b) (1983).   The regulations also permit consistency determinations to be made in phases as new information develops.   See § 930.37(c).

[17] In this connection the arrangement of the four subparagraphs of § 307 is instructive.   That section obligates four categories of parties to conform their activities, to the maximum extent practicable, with approved state management programs.   The four categories are (1) federal agencies conducting or supporting activities directly affecting the coastal zone; (2) federal agencies undertaking development projects in the coastal zone; (3) private parties who apply for a license or permit to conduct activities in the coastal zone; and (4) state and local governments submitting applications for federal assistance under programs affecting the coastal zone.   Neither subparagraph (2) nor (4) has any application to the case before us.   It is subparagraph (3), that requires private parties to comply with state programs.   Unless subparagraph (1) applies to the Secretary of the Interior, Congress simply omitted entirely the federal activity of selecting the tracts that will be leased from the conformity requirement.   If lessees must ultimately conform their activities, to the maximum extent practicable, with the approved state programs, it is difficult to understand why Congress would not have wanted the original planning that preceded the lease sales also to be consistent with the approved program.

zone—if it is in fact the functional equivalent of activity "in" the zone—it is inconceivable that Congress would have wanted it to be treated any differently.

The *only* federal activity that ever occurs with respect to OCS oil and gas development is the decision to lease; all other activities in the process are conducted by lessees and not the Federal Government. If the leasing decision is not subject to consistency requirements, then the intent of Congress to apply consistency review to federal OCS activities would be defeated and this part of the statute rendered nugatory. Such a construction must be rejected. See *American Textile Mfrs. Institute, Inc.* v. *Donovan*, 452 U. S. 490, 513 (1981); *Mercantile Nat. Bank* v. *Langdeau*, 371 U. S. 555, 560 (1963); *United States* v. *Shirey*, 359 U. S. 255, 259–260 (1959); *United States* v. *Harriss*, 347 U. S. 612, 622–623 (1954); *Sunshine Coal Co.* v. *Adkins*, 310 U. S. 381, 392 (1940).[18]

---

[18] My view, unlike the Court's, is consistent with that of the agency charged by Congress with administering the CZMA, the National Oceanic and Atmospheric Administration (NOAA). While the majority correctly points out that NOAA has waffled on the specific issue of whether there should be a special rule for OCS oil and gas leasing, *ante*, at 320–321, n. 6, it has consistently rejected the majority's position that federal activities in the OCS need not be evaluated to see if they directly affect the coastal zone. To the contrary, NOAA has agreed with the position formerly taken by the Department of Justice (which itself later waffled on this issue, see n. 35, *infra*), that the question whether OCS leasing activity is subject to consistency review is one of fact to be decided on a case-by-case basis. See 44 Fed. Reg. 37142 (1979). The NOAA regulation on this subject (which remains in effect) states: "Federal activities outside of the coastal zone (e. g., on excluded Federal lands, on the Outer Continental Shelf, or landward of the coastal zone) are subject to Federal agency review to determine whether they directly affect the coastal zone." 15 CFR § 930.33(c) (1983). NOAA also urged federal agencies "to construe liberally the 'directly affecting' test in borderline cases so as to favor inclusion of Federal activities subject to consistency review." 44 Fed. Reg. 37146–37147 (1979).

## The Direct Effects

The lease sales at issue in these cases are in fact the functional equivalent of an activity conducted in the zone. There is no dispute about the fact that the Secretary's selection of lease tracts and lease terms constituted decisions of major importance to the coastal zone. The District Court described some of the effects of those decisions:

> "For example, a reading of the notice itself reveals some of the many consequences of leasing upon the coastal zone. The 'Notice of Oil and Gas Lease Sale No. 53 (Partial Offering)', as published in the Federal Register, announced ten stipulations to be applied to federal lessees. The activities permitted and/or required by the stipulations result in direct effects upon the coastal zone. Stipulation No. 4 sets forth the conditions for operation of boats and aircraft by lessees. Stipulation No. 6 states the conditions under which pipelines will be required; the Department of Interior, as lessor, specifically reserves the right to regulate the placement of 'any pipeline used for transporting production to shore'. Lessees must agree, pursuant to stipulation No. 1, to preserve and protect biological resources discovered during the conduct of operations in the area.
>
> "The Secretarial Issue Document ('SID'), prepared in October 1980 by the Department of Interior to aid the Secretary in his decision, contains voluminous information indicative of the direct effects of this project on the coastal zone. For instance, the SID contains a table showing the overall probability of an oilspill impacting a point within the sea otter range during the life of the project in the northern portion of the Santa Maria Basin to be 52%. Both the SID and the EIS [Environmental Impact Statement] contain statistics showing the likelihood of oilspills during the life of the leases; based on the unrevised USGS estimates, 1.65 spills are expected during the project conducted in the Santa Maria subarea.

According to the SID, the probability of an oilspill is even higher when the revised USGS figures are utilized.

". . . Both documents refer to impacts upon air and water quality, marine and coastal ecosystems, commercial fisheries, recreation and sportfishing, navigation, cultural resources, and socio-economic factors. For instance, the EIS states that '[n]ormal offshore operations would have unavoidable effects . . . on the quality of the surrounding water'. Pipelaying, drilling, and construction, chronic spills from platforms, and the discharge of treated sewage contribute to the degradation of water quality in the area. As to commercial fisheries, drilling muds and cuttings 'could significantly affect fish and invertebrate populations'; the spot prawn fishery in the Santa Maria Basin is particularly vulnerable to this physical disruption. In reference to recreation and sportfishing, the EIS indicates the possibility of adverse impacts as a result of the competition for land between recreation and OCS-related onshore facilities as a result of the temporary disruption of recreation areas caused by pipeline burial. There are the additional risks of 'the degradation of the aesthetic environment conducive to recreation and the damage to recreational sites as a result of an oil spill'. Another impact on the coastal zone will occur as a result of the migration of labor into the area during the early years of oil and gas operations. Impacts on the level of employment and the size of the population in the coastal region are also predicted.

"The SID notes that there are artifacts of historic interest as well as aboriginal archaeological sites reported in the area of the Santa Maria tracts. The FWS and NMFS biological opinions, appended to the SID, indicate the likelihood that development and production activities may jeopardize the existence of the southern sea otter and the gray whale.

"These effects constitute only a partial list. Further enumeration is unnecessary. The threshold test under

§ 307(c)(1) would in fact be satisfied by a finding of a single direct effect upon the coastal zone. Although the evidence of direct effects is substantial, such a showing is not required by the CZMA." 520 F. Supp. 1359, 1380–1382 (CD Cal. 1981) (footnotes and citations omitted).

The Court of Appeals predicated its conclusion that the lease sale in these cases directly affects the coastal zone on these findings. It wrote:

"We agree that the lease sale in this case directly affects the coastal zone. These direct effects of Lease Sale 53 on California's coastal zone are detailed by the district court. We need not repeat them here. It is enough to point out that decisions made at the lease sale stage in this case establish the basic scope and charter for subsequent development and production. Prior to the sale of leases, critical decisions are made as to the size and location of the tracts, the timing of the sale, and the stipulations to which the leases would be subject. These choices determine, or at least influence, whether oil will be transported by pipeline or ship, which areas of the coastal zone will be exposed to danger, the flow of vessel traffic, and the siting of on-shore construction.

"Under these circumstances Lease Sale 53 established the first link in a chain of events which could lead to production and development of oil and gas on the individual tracts leased. This is a particularly significant link because at this stage all the tracts can be considered together, taking into account the cumulative effects of the entire lease sale, whereas at the later stages consistency determinations would be made on a tract-by-tract basis under section 307(c)(3)." 683 F. 2d 1253, 1260 (CA9 1982) (citations omitted).

Neither petitioners nor the Court challenges these findings, which clearly state that the oil and gas lease sale at issue here

will directly affect the coastal zone. Oil and gas exploration and development are the expected and desired results of the leasing decision which respondents seek to have reviewed under § 307(c)(1), and their impact on the coastal zone will be undeniably significant. Moreover, the findings indicate some of those impacts will occur almost immediately, prior to review under the Outer Continental Shelf Lands Act (OCSLA), and can never be reviewed adequately if they are not reviewed now.[19]

In my judgment these rather sensible appraisals of the probable consequences of the lease sale are entirely consistent with the congressional intent reflected in § 307(c)(1). It cannot be denied that in reality OCS oil and gas leasing "directly" looks toward development of the OCS, and the consequences for the coastal zone that the District Court found development would entail. Development is the expected consequence of leasing; if it were not, purchasers would

---

[19] The California Coastal Commission, the state agency responsible for the administration of the state management plan, made this same point in objecting to the lease sale at issue here. "The Commission's objections to Lease Sale 53 cannot be resolved later at the plan of exploration stage because they involve such major concerns as the lack of onshore facilities, land, and population that can accommodate oil development." App. 118. The Commission believed that inclusion of four specific areas in the sale is inconsistent with its management plan because (1) it leases tracts that are close to areas considered marine sanctuaries or marine resource areas which must be protected from development under the state plan, (2) it will require transportation of oil through the range of the endangered sea otter, which is an environmentally sensitive area that must be protected from such transportation under the state plan, (3) it would affect the scenic and visual qualities of protected recreational areas, (4) it will require the construction of facilities that are not sufficiently justified in terms of the "public welfare" as defined by the plan, and (5) there was not sufficient planning for future demands on coastal resources as required by the state plan. *Id.*, at 120–132. The area of dispute involves 29 of 111 tracts proposed for leasing containing about 8 percent of the oil reserves projected from the sale area. *Id.*, at 148. Prior to this sale, the Commission had concurred in 26 out of 27 OCS lease sales proposed by the Department of the Interior. *Id.*, at 117–120, 154.

never commit millions of dollars to the acquisition of leases. Congress views leasing in exactly this way; it has defined the lease acquired by purchasers as a "form of authorization . . . which authorizes exploration for, and development and production of, minerals . . . ." 92 Stat. 632, 43 U. S. C. § 1331(c) (1976 ed., Supp. V). As the Court of Appeals observed, leasing sets into motion a chain of events designed and intended to lead to exploration and development. When the intended and most probable consequence of a federal activity is oil and gas production that will dramatically affect the adjacent coastal zone, that activity is one "directly affecting" the coastal zone within the meaning of § 307(c)(1).

## II

The Court's holding rests, in part, on selections from legislative developments subsequent to the enactment of the CZMA in 1972. In my view the 1978 amendment to the OCSLA on which the Court relies lends no support to its reading of § 307(c)(1) of the CZMA. On the contrary, a fair review of the post-1972 history reveals such a dramatically different congressional understanding of the meaning of its own work product that it merits a rather detailed treatment. I shall comment on this history in chronological order.

### The 1976 Amendment to CZMA

The CZMA was amended in 1976. One of the primary purposes for this legislation was the recognition that OCS leasing has a dramatic impact on the coastal zone. The 1976 legislation created a program of federal financial aid to coastal areas in order to help them deal with the impact of OCS leasing. The amount of money each State received was keyed to the amount of adjacent OCS acreage that had been leased by the Federal Government. 90 Stat. 1019–1028, 16 U. S. C. § 1456a (1982 ed.). This provision was added pre-

cisely because Congress recognized that OCS leasing could dramatically affect the adjacent coastal zone, not only environmentally but socially and economically. See S. Rep. No. 94–277, pp. 10–19 (1975); H. R. Rep. No. 94–878, pp. 13, 15–17 (1976);[20] 121 Cong. Rec. 23055–23056 (1975) (remarks of Sen. Stevens); id., at 23060 (remarks of Sen. Jackson); id., at 23065 (remarks of Sen. Magnuson); 122 Cong. Rec. 6111–6112 (1976) (remarks of Rep. Sullivan); id., at 6112 (remarks of Rep. Du Pont); id., at 6113 (remarks of Rep. Mosher); id., at 6114 (remarks of Rep. Murphy); id., at 6117 (remarks of Rep. Young); id., at 6119 (remarks of Rep. Lagomarsino); id., at 6120 (remarks of Rep. Hughes); id., at 6121–6122 (remarks of Rep. Drinan).[21] This congressional recognition completely undermines the Court's position that OCS oil and gas leasing can never directly affect the coastal zone.

Both the Senate and House versions of the 1976 amendments reported out of committee explicitly applied the consistency requirement of § 307 to OCS oil and gas leasing. See S. 586, 94th Cong., 1st Sess., § 102(12) (1975), reprinted in S. Rep. No. 94–277, p. 59 (1975);[22] H. R. 3981, 94th Cong., 2d Sess., § 2(15) (1976), reprinted in H. R. Rep. No. 94–878, p. 4 (1976). The significant point here is that at every opportunity, Congress indicated that all it was doing by these provi-

[20] In fact, the House Report contains an attachment which details at some length the impacts of OCS oil and gas leasing on the coastal zone. See H. R. Rep. No. 94–878, pp. 119–126 (1976).

[21] For additional statements demonstrating the effects of leasing decisions on the coastal zone, see Congressional Research Service, Effects of Offshore Oil and Natural Gas Development on the Coastal Zone, A Study Prepared for the Ad Hoc Select Committee on Outer Continental Shelf, 94th Cong., 2d Sess., 93 (Comm. Print 1976); Office of Technology Assessment, Offshore Oil and Gas Development, A Study for the Ad Hoc Select House Committee on Outer Continental Shelf, 95th Cong., 1st Sess., 155–157 (Comm. Print 1977).

[22] See also S. Rep. No. 94–277, pp. 19–20 (1975).

sions was restating what had been its original intent in the 1972 CZMA. For example, the Senate Report stated:

> "Section 307 is the portion of the Act which has come to be known as the 'Federal consistency' section. It assures that once State coastal zone management programs are approved and a rational management system for protecting, preserving, and developing the State's coastal zone is in place (approved), the Federal departments, agencies, and instrumentalities will not violate such system but will, instead, conduct themselves in a manner consistent with the States' approved management program. *This includes conducting or supporting activities in or out of the coastal zone which affect that area.* . . . As energy facilities have been focused upon more closely recently, the provisions of section 307 for the consistency of Federal actions with the State coastal zone management programs has *[sic]* provided assurance to those concerned with the coastal zone that the law already provides an effective mechanism for guaranteeing that Federal activities, including those supported by, and those carried on pursuant to, Federal authority (license, lease, or permit) will accord with a rational management plan for protection, preservation and development of the coastal zone. *One of the specific federally related energy problem areas for the coastal zone is, of course, the potential effects of Federal activities on the Outer Continental Shelf beyond the State's coastal zones*, including Federal authorizations for non-Federal activity, but *under the act as it presently exists*, as well as the S. 586 amendments, if the activity may affect the State coastal zone and it has an approved management program, the consistency requirements do apply." S. Rep. No. 94–277, *supra*, at 36–37 (emphasis supplied).[23]

---

[23] See also *id.*, at 52–53.

Similarly, the House Report states:

"Specifically what the section does is add the word 'lease' to 'licenses and permits' in section 307(c)(3). This clarifies the scope of the coverage of those federal actions which must be certified as complying with a state's approved coastal management program. The Committee felt, because of the intense interest in the matter on the part of a number of states, it would make explicit its view that *federal leasing is an activity already covered by section 307 of the Act.*

"To argue otherwise would be to maintain that a federal permit for a wastewater discharge, for example, must be certified by the applicant to be in compliance with a state program, the state being given an opportunity to approve or disapprove of the proposal, while a federal lease for an Outer Continental Shelf tract does not have to so certify. *Given the obvious impacts on coastal lands and waters which will result from the federal action to permit exploration and development of offshore petroleum resources, it is difficult to imagine that the original intent of the Act was not to include such a major federal coastal action within the coverage of 'federal consistency.'*" H. R. Rep. No. 94–878, *supra,* at 52 (emphasis supplied).[24]

Along the same lines, the Report also stated that "the Committee wants to assure coastal states in frontier areas that the OCS leasing process is indeed a federal action that un-

---

[24] The Senate Report also stated: "There is very little coordination or communication between Federal agencies and the affected coastal States prior to major energy resource development decisions, *such as the decision to lease large tracts of the OCS for oil and gas* .... Full implementation of the Coastal Zone Management Act of 1972 and recognition of its capability to solve energy-related conflicts could go far to institute the broad objectives of Federal-State cooperative planning envisioned by the framers of the act." *Id.,* at 3 (emphasis supplied).

doubtedly has the potential for affecting a state's coastal zone and, hence, must conform with approved state coastal management programs." *Id.*, at 37. Statements to similar effect were made by sponsors of the legislation on the floors of both Houses.[25]

Though the explicit reference to OCS leasing was deleted by the Conferees, their Report indicates that the reason for the deletion was not disagreement with the concept of applying § 307 to OCS leasing, but rather to supplement that requirement by applying consistency to other stages in the process as well.[26] The subsequent debates on the Conference Report evince no retreat from the position that OCS leasing should be consistent with state management programs. In light of the widespread agreement by Congress in 1976 that OCS leasing was already subject to consistency review under the 1972 CZMA, the logical explanation for the Conferees' action is simply that they saw no need to amend the CZMA since everyone agreed that it already applied to OCS oil and gas leasing. The only need was to further ex-

---

[25] See 121 Cong. Rec. 23075 (1975) (remarks of Sen. Tunney); *id.*, at 23082 (remarks of Sen. Kennedy); *id.*, at 23084 (remarks of Sen. Williams); 122 Cong. Rec. 6117 (1976) (remarks of Rep. Forsythe). Similar statements were made emphasizing the breadth of the consistency requirement. See, *e. g.*, *id.*, at 6112 (remarks of Rep. Du Pont) ("Once a State has an approved coastal zone management plan in place, all subsequent Federal activities which affect the coastal zone must be found to be consistent with adopted State management programs"); *id.*, at 6113 (remarks of Rep. Lent) (The 1972 CZMA "provides for the representation of local, State, and regional interests . . . in the making of decisions affecting the coastal zone areas").

[26] "The Senate bill required that each Federal lease (for example, offshore oil and gas leases) had to be submitted to each state with an approved coastal zone management program for a determination by that state as to whether or not the lease was consistent with its program. The conference substitute further elaborates on this provision and specifically applies the consistency requirement to the basic steps in the OCS leasing process—namely, the exploration, development and production plans submitted to the Secretary of the Interior." H. R. Conf. Rep. No. 94–1298, p. 30 (1976).

tend consistency review to subsequent stages in the process. This view is explicitly supported by the House's consideration of the amendments, where it was made clear that Congress believed that OCS leasing was subject to consistency requirements. Representative Hughes said:

"I am disappointed, however, that the amendment offered by Mr. DU PONT to delete the provision requiring that Federal offshore leasing be consistent with State coastal zone management plans has been agreed to. I nevertheless rely upon the record established during today's debate to show that *it is the intent of this legislation that offshore leasing not be in conflict with State management plans.*" 122 Cong. Rec. 6120 (1976) (emphasis supplied).[27]

The failure of the Conferees to include the proposed language in the CZMA is all the more illuminating in light of the fact that the proposal before the Conferees was to amend § 307(c)(3), which details the consistency obligations of private lessees. This proposal was entirely irrelevant to the obligations of the Secretary of the Interior since that subsection does not apply to the Secretary. Thus, the Conferees simply saw no reason to add language covering OCS leasing to subsection (c)(3) when there was agreement that it was already covered by (c)(1).[28] In any event, whatever the ex-

---

[27] Representative Du Pont himself stated that he also believed that OCS leasing was subject to consistency requirements. See 122 Cong. Rec. 6128 (1976).

[28] This observation was later made in a statement signed by one of the principal sponsors of the 1976 legislation, Representative Studds.

"Nowhere, in this entire set of deliberations [in 1976], was there any explilct *[sic]* or implicit reference to consistency decisions by the Department of the Interior in its pre-lease activity pursuant to Section 307(c)(1). The focus was on the proper time for a state to certify a private company's activity—not on the federal agency's obligations under Section 307(c)(1).

"The deletion of 'lease' from Section 3[0]7(c)(3) was an agreement by the Congress that a State would have better information on which to base a

planation for the Conferees' failure to amend § 307(c)(3), the legislative history contains no ambiguities on one point— everyone to address the issue agreed that § 307(c)(1) already applied to federal OCS oil and gas leasing decisions. This is not merely "postenactment" legislative history, for this was a central premise on which Congress *legislated* when it decided that § 307 need be extended only to subsequent stages in the process of oil and gas development.

*The 1978 Amendments to OCSLA*

In 1978, Congress passed the Outer Continental Shelf Lands Act Amendments, 92 Stat. 629. The majority relies on these Amendments, concluding that since they require federal approval prior to exploration or development by OCS lessees, they make it clear that mere OCS leasing cannot invoke the consistency requirement of § 307(c)(1) of the CZMA. *Ante,* at 337–340. After all, as the Court recites, these leases are subject to cancellation and most of the specific activities contemplated by the leases must be approved before they take place. At most, however, this simply raises a factual question that the District Court has answered in these cases—does the necessity for approval of exploration and development under OCSLA mean that the leasing decision does not "directly affect" the coastal zone because of the contingent nature of the leasing? Posing that question in no sense obviates the need for the factual analysis demanded by § 307(c)(1). The question whether the leasing decision "directly affects" the coastal zone must still be confronted.

This is made clear by the text of the OCSLA Amendments, which explicitly preserves the pre-existing provisions of the

---

307(c)(3) decision later in the process—i. e., at the exploration and development stage—than when the oil company simply had been awarded a lease. Such deletion, however, had absolutely no reference to the range of pre-leasing decisions made by the Interior Department and no implication is warranted with respect to the Section 307(c)(1) issue here." H. R. Rep. No. 97–269, p. 14 (1981) (additional views of Reps. Studds and D'Amours).

CZMA. "Except as otherwise expressly provided in this Act, nothing in this Act shall be contrued to amend, modify, or repeal any provision of the Coastal Zone Management Act of 1972 . . . ." 92 Stat. 698, 43 U. S. C. § 1866(a) (1976 ed., Supp. V). Moreover, the legislative history of this provision indicates that it was intended to *require* consistency review of federal OCS leasing activity. In the only discussion of this question during the entire consideration of the OCSLA Amendments, the House Report[29] made it clear that the consistency obligation of the CZMA would continue to apply to OCS leasing decisions.

> "The committee is aware that under the Coastal Zone Management Act of 1972, as amended in 1976 (16 U. S. C. 1451 et seq.), certain OCS activities *including lease sales* and approval of development and production plans must comply with 'consistency' requirements as to coastal zone management plans approved by the Secretary of Commerce. Except for specific changes made by Titles IV and V of the 1977 Amendments, nothing in this act is intended to amend, modify, or repeal any provision of the Coastal Zone Management Act. Specifically, nothing is intended to alter procedures under that Act for consistency once a State has an approved Coastal Zone Management Plan." H. R. Rep. No. 95–590, p. 153, n. 52 (1977) (emphasis supplied).[30]

One could not ask for a more explicit indication of legislative intent. The Court can find no indication of any intent to the

---

[29] The Report also incorporates by reference the earlier Congressional Research Service report, cited in n. 21, *supra,* detailing the impact of OCS leasing decisions on the coastal zone. See H. R. Rep. No. 95–590, p. 55, n. 1 (1977).

[30] See also 124 Cong. Rec. 2057–2058 (1978) (remarks of Rep. Murphy) ("I want to assure my colleagues that we are simply making sure that the provisions of the 1976 Coastal Zone Management Act consistency amendments will continue to operate in these revised OCS procedures").

contrary. Thus, the premise of the 1978 legislation, like the 1976 amendment to the CZMA, was that consistency review would be applied to OCS leasing.

Even more important is § 18 of the OCSLA, 92 Stat. 649, 43 U. S. C. § 1344 (1976 ed., Supp. V), which governs the OCS leasing program. Subsection (f) provides, in pertinent part: "The Secretary shall, by regulation, establish procedures for . . . consideration of the coastal zone management program being developed or administered by an affected coastal State pursuant to Section 1454 or 1455 of title 16 [the CZMA]." This provision was added "for coordination of the [leasing] program with management programs and consistency requirements established pursuant to the Coastal Zone Management Act of 1972." H. R. Rep. No. 95–590, *supra*, at 151; S. Rep. No. 95–284, p. 77 (1977).[31] Section 18 of the OCSLA makes it clear, if it were not previously, that state coastal management plans must be considered by the Secretary at the OCS leasing stage.[32] Thus, both the saving clause and § 18(f) establish that Congress intended that consistency determination under the CZMA be made for OCS leasing decisions when it enacted the 1978 OCSLA Amendments.

In any event, the fact that additional licensing is required under the OCSLA scheme for exploration and development hardly makes those steps "indirect" consequences of leasing in the sense that any effect on the coastal zone is the result of intervening causes, which is the definition of "indirect" urged by petitioners.[33] Approval for exploration and development

---

[31] See also S. Rep. No. 95–284, pp. 43–44 (1977); S. Conf. Rep. No. 95–1091, p. 105 (1978).

[32] Regulations have been issued governing oil and gas leasing which implement this requirement by requiring consideration of state coastal zone management plans. See 43 CFR § 3310.4 (1982).

[33] The Court does not offer a definition of the term "directly" for purposes of § 307(c)(1) since it takes the position that the statute does not extend to OCS activities. Therefore, I address only petitioners' definition.

by the lessee is obviously the expected and intended result of leasing; if it were not, the Secretary would not bother to lease and the lessees would not bother to bid. Subsequent exploration and development is hardly an intervening cause; it is the natural and expected consequence of the original lease, and hence the "direct" effect of leasing. It would be disapproval of exploration and development that would constitute an intervening cause, not the expected approval.[34]

## The 1980 Amendment to CZMA

In 1980, the CZMA was reauthorized and again amended. 94 Stat. 2060. In the course of considering the statute, Congress once again addressed the precise problem we are faced with today. Once again its answer was the same—OCS oil and gas leasing is subject to the consistency obligation of § 307(c)(1) of the CZMA. The House Report, for example, observed that the 1976 amendments had not altered this obligation. "The change did not alter Federal agency responsibility to provide States with a consistency determination related to OCS decisions which preceded issuance of leases." H. R. Rep. No. 96–1012, p. 28 (1980). The Report then went on to consider whether § 307 needed to be amended, and declined to do so only after determining that it clearly applied to OCS leasing.

"Finally, the committee has not recommended any changes in the Federal consistency provision, section 307 of the existing act. During its oversight phase, the

---

[34] Moreover, petitioners argue only that any "physical" impacts on the coastal zone depend on future licensing and hence are indirect. Petitioners cannot address the economic or social impacts of the leasing decision, however, which are not dependent upon subsequent approval, and which may well result in direct effects on the coastal zone, as Congress recognized both in the 1971 Senate Report and the 1976 CZMA amendments. As noted above, the findings of fact made by the lower courts indicate that the proposed lease sale at issue here would have had direct economic and social effects on the coastal zone.

committee heard much testimony on these provisions. However, the consensus of witnesses advocated no change. . . .

". . . Generally all consistency provisions have been properly construed. The only uncertainty that has arisen concerns the interpretation of section 307(c)(1), the threshold test of 'directly affecting' the coastal zone. The committee points out that in the preamble to NOAA's Federal consistency regulations, this threshold test was considered during earlier congressional deliberations and was determined to apply whenever a Federal activity had a functional interrelationship from an economic, geographic or social standpoint with a State coastal program's land or water use policies. Under such circumstances, a State has a legitimate interest in reviewing a proposed Federal activity since the management program's policies are likely to apply to the activity. Thus, when a Federal Agency initiates a series of events of coastal management consequence, the intergovernmental coordination provisions of the Federal consistency requirements should apply." *Id.*, at 34.

Similarly, the Senate Report described the 1976 amendments as having maintained the consistency obligation for OCS leasing:

"The Department of Interior's activities which preceded OCS lease sales were to remain subject to the requirements of section 307(c)(1) [under the 1976 CZMA]. As a result, intergovernmental coordination for purposes of OCS development commences at the earliest practicable time in the opinion of the Committee, as the Department of the Interior sets in motion a series of events which have consequences in the coastal zone. Coordination must continue during the critical exploration, development, and production stages.

"The Committee see[s] no justification to depart from this point of view. The Committee hopes that through

the rulemaking, future areas of disagreement over the application of Federal consistency will be substantially reduced, especially given the excellent record of application shown by the coastal States." S. Rep. No. 96–783, p. 11 (1980).[35]

Thus, the 1980 legislative history indicates that when Congress reauthorized the CZMA it intended § 307(c)(1) to be applied to OCS leasing decisions. Congress unmistakably rejected the position embraced by the majority today.[36]

---

[35] To make sure of the correct construction of the Act, two sponsors of the 1980 amendments conducted a colloquy on the floor of the House in which they indicated that the intent of Congress was to apply § 307(c)(1) to OCS leasing decisions if as a factual matter they affected the coastal zone.

"[Mr. MCCLOSKEY.] Do any portions of the Coastal Zone Management Improvement Act or the report language change the provisions of section 307 of the Coastal Zone Management Act on coordination and cooperation, the so-called Federal consistency provision?

"Mr. STUDDS. I would like to assure my colleague that nothing in H. R. 6979 nor its accompanying report changes the intent of the Federal consistency provision. In testimony before the Subcommittee on Oceanography, we heard from many witnesses that this section is critical for the effective implementation of State management programs. Since the consistency provisions are important to the act and appear to be working, no changes were made to section 307 of the act.

"Mr. MCCLOSKEY. I assume that this means also that there are no changes in the bill or the report language which further modify the term 'directly affecting' which occurs in section 307(c)(1) of the original statute.

"Mr. STUDDS. The gentleman from Washington is correct. The term 'directly affecting is essentially one of fact' as the Department of Justice has previously concluded." 126 Cong. Rec. 28458 (1980).

Representative Studds' reference was to the Department of Justice's previously stated position that § 307(c)(1) did apply to OCS leasing activity if, in fact, a given leasing decision could be said to directly affect the coastal zone. See App. 35–47.

[36] Even if the Court were correct to view the 1980 history as not part of the legislative history of the CZMA, despite the fact that Congress in fact reauthorized the CZMA in 1980 and explicitly stated its view as to the correct construction of § 307(c)(1), this nevertheless qualifies as the view of a subsequent Congress and is not without persuasive value. See, e. g., Bell v. New Jersey, 461 U. S. 773, 784–785 (1983); Bob Jones Univ. v. United States, 461 U. S. 574, 599–602 (1983); Andrus v. Shell Oil Co., 446 U. S. 657, 666, n. 8 (1980).

*Postscript in 1981*

After the new administration took office in 1981, the Secretary of Commerce proposed a CZMA regulation which would have removed OCS leasing decisions from the scope of consistency review.[37]  The House Committee on Merchant Marine and Fisheries promptly considered whether to exercise a legislative veto over the regulations[38] and overwhelmingly voted to veto the regulations.  H. R. Rep. No. 97–269, pp. 7–8 (1981).  The regulations were later withdrawn, in an apparent administrative concession of error.  47 Fed. Reg. 4231 (1982).  Apparently this is the last of a long series of congressional actions indicating that body's intent that OCS leasing be subject to consistency review under § 307(c)(1) of the CZMA.

In sum, the intent of Congress expressed in the plain language of the statute and in its long legislative history unambiguously requires consistency review if an OCS lease sale directly affects the coastal zone.  The affirmative findings of fact made by the lower courts on that score are amply supported and are not disturbed by the Court today.

I therefore respectfully dissent.

---

[37] See 46 Fed. Reg. 26660 (1981).

[38] See 16 U. S. C. § 1463a (1982 ed.).